UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 08 CV 1639 |
| | ) | (No. 05 CR 546) |
| v. | ) | Judge James B. Zagel |
| | ) | |
| WILLIAM MOOREHEAD | ) | |

### GOVERNMENT'S RESPONSE TO WILLIAM MOOREHEAD'S MOTION UNDER 28 U.S.C. § 2255

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, the United States Attorney for the Northern District of Illinois, Eastern Division, hereby responds to defendant William Moorehead's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, as set forth below.

Defendant William Moorehead ("Moorehead") waived his right to bring this motion, and his arguments fail on the merits. Because the motion, files, and records conclusively show that Moorehead is not entitled to relief, no evidentiary hearing is necessary.

### **Background**

On June 15, 2005, a federal grand jury charged Moorehead with two counts of wire fraud, in violation of 18 U.S.C. § 1343. Moorehead pled guilty to these charges on April 13, 2006 pursuant to the terms of a plea agreement. Copies of the Plea Agreement ("Plea") and a transcript of the change of plea hearing ("Tr.") are attached as exhibits. When Moorehead pled guilty, he admitted that he had engaged in an 8-year scheme to defraud his clients, and that he misappropriated at least $995,000. See Plea at pp. 3-8; Tr. at pp. 14-16.

In the plea agreement, the parties agreed that the preliminary projected applicable offense level was a level 23, with a Criminal History Category of I, so that the preliminary projected applicable sentencing range was 46 to 57 months. See Plea at p.10. The plea agreement stated that the final sentence would be determined by the sentencing judge only, and that the judge would not be bound to follow the calculations set forth in the agreement. *Id*. at pp. 11, 17. In the plea agreement, Moorehead waived his right to attack his sentence in a collateral manner, such as a § 2255 petition. *Id.* at p. 14-15.

During the in-court colloquy that preceded this Court's acceptance of Moorehead's plea of guilt, Moorehead acknowledged under oath that no one had made him any promises or assurances outside of the plea agreement to induce him to plead guilty. Tr. at 13. Moorehead confirmed that no one had forced him, or threatened him in any way to cause him to plead guilty. *Id*. Moorehead also acknowledged that the decision to plead guilty was entirely voluntary. *Id*.

During the change of plea, Moorehead stated that he had read the plea agreement. Tr. at p. 10. Moorehead said that he had discussed the plea agreement with his lawyer. *Id.* Moorehead said that he had had enough time to talk to his attorney, and that Moorehead had told his attorney everything that Moorehead knew about the case. *Id. at 6.* Moorehead said that no agreements or promises had been made that were not contained in the plea agreement. *Id.* Moorehead said that after he read the plea agreement, he signed it. *Id.*

Moorehead acknowledged that he had agreed that the applicable guideline range was

2

46 to 57 months.  *Id*. at 11.  Moorehead also expressed his understanding that the final decision of what Moorehead's sentence would be rested with the Court.  *Id*.  At sentencing, the Court imposed a sentence of 48 months incarceration, which was near the low end of the applicable sentencing range to which Moorehead had agreed.

Moorehead was represented by Luis Galvan ("Galvan") from June 2005 (beginning with Moorehead's first appearance in court) through approximately March 2007. Galvan negotiated and signed the plea agreement in 2006.  Galvan filed a Sentencing Memorandum on behalf of Moorehead in September 2006.  A copy of the Sentencing Memorandum is attached herewith as an exhibit.

On December 31, 2007, the Attorney Registration and Disciplinary Committee ("ARDC") filed a complaint against Galvan. See Moorehead's Exhibit B.  The complaint was filed **eight months after Moorehead pled guilty**.  According to the complaint, the ARDC opened its investigation in November 2006, after receiving a letter.  *Id*. at ¶ 10.  The ARDC's complaint against Galvan was not filed until months after Moorehead pled guilty, and there was no activity in court between the time that the ARDC opened its investigation in November 2006 and the time that Galvan stopped representing Moorehead in March 2007.

On March 8, 2007, Imani Chiphe ("Chiphe") was appointed to represent Moorehead. Chiphe represented Moorehead at his sentencing on April 26, 2007.

This Court sentenced Moorehead to 48 months imprisonment.  On March 20, 2008,

Moorehead filed this motion under 28 U.S.C. § 2255[1].

## Legal Standard

Section 2255 permits a prisoner to "move the court which imposed the sentence to vacate, set aside, or correct the sentence." Such collateral relief is only available, however, where there was "an error of law that is jurisdictional, constitutional, or constitutes a 'fundamental defect which inherently results in a complete miscarriage of justice.'" *Bischel v. United States*, 32 F.3d 259, 263 (7th Cir. 1994) (quoting *Borre v. United States*, 940 F.2d 215, 217 (7th Cir. 1991)). In evaluating a § 2255 petition, the district court must review the record and draw all reasonable inferences in favor of the government. *Carnine v. United States*, 974 F. 2d 924, 928 (7th Cir. 992). Because Moorehead has filed his motion *pro se,* the motion is entitled to a liberal reading. *Haines v. Kerner,* 404 U.S. 519, 520 (1972).

## Moorehead's Arguments

Moorehead's motion raises three issues for review. First, Moorehead argues that Luis Galvan provided ineffective assistance of counsel during plea negotiations, because the ARDC had filed a Complaint against Galvan, and Galvan therefore caused Moorehead to accept a plea agreement that was unfair to Moorehead. He argues that Galvan also failed to discuss the facts, the law, and the Guidelines, and that Galvan promised that Moorehead would receive either probation or house arrest, and less than 6 months in custody. Second,

---

[1] Moorehead did not appeal his conviction or sentence following the judgment entered by this Court. Rather, Moorehead expressly waived his right to appeal in his plea agreement.

Moorehead argues that he was depressed prior to pleading guilty, and therefore he did not enter into the plea agreement knowingly and voluntarily. Third, Moorehead argues that Imani Chiphe provided ineffective assistance of counsel because Chiphe asserted that Galvan had already addressed certain sentencing issues and certain Guidelines enhancements. Moorehead also asserts that Chiphe could have filed a motion to withdraw the plea agreement.  None of these arguments have merit.

Moorehead waived the right to make these claims, since they do not directly address the issue of the negotiation of the waiver.  In addition, the arguments fail on the merits.

First, the ARDC did not file a complaint against Galvan until approximately 8 months after Moorehead pled guilty, so that the ARDC complaint had no impact on the plea negotiations.  Moorehead's claims that Galvan guaranteed a certain sentence, and his claims that Galvan did not discuss the plea agreement with him, are contradicted by the plea colloquy.  At the change of plea, Moorehead stated that he had read the plea agreement, had discussed the plea agreement with his attorney, and no promises or agreements had been made that were not contained in the plea agreement, which demonstrates that Moorehead did not rely on any promises made by Galvan, and that they had discussed the plea agreement.

Second, in terms of Moorehead's alleged depression, the record shows that he was competent to enter a plea of guilty.

Third, Chiphe representations were accurate, in that Galvan had addressed the sentencing issues in a Sentencing Memorandum.  Moorehead does not assert that he asked

Chiphe to withdraw the plea agreement, and a review of the transcript from the change of plea shows that there was no basis for withdrawing the plea. Thus, Moorehead's motion should be denied without a hearing[2].

## DISCUSSION

### Moorehead Waived his Right to File This Motion

In his plea agreement, Moorehead expressly waived both his right to appeal his sentence and his right to challenge his sentence in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255. See Plea at pp. 14-15[3].

The Seventh Circuit has held that a voluntary and knowing waiver of an appeal is valid and must be enforced. See *United States v. Sines*, 303 F.3d 793, 798 (7th Cir. 2002).

---

[2]    Prior to the indictment in June 2005, Moorehead was represented by Mike Monico ("Monico"). The defendant alleges that Monico provided ineffective assistance of counsel by withdrawing as Moorehead's attorney prior to indictment, although he acknowledges that Galvan immediately stepped in to represent Moorehead, so he did not lack representation. Moorehead also acknowledges that Monico had nothing to do with the negotiation of the plea agreement. The Court should deny Moorehead's motion as it relates to Monico because Moorehead fails to articulate any specific conduct that constituted ineffective assistance on the part of Monico. *See Moya-Gomez*, 860 F.2d at 763-764 ("The defendant must identify the specified acts or omissions of counsel that form the basis for his claim of ineffective assistance.").

[3]    Paragraph 13 of the plea agreement provides the following:
The defendant is also aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal the sentence imposed. Acknowledging this, the defendant knowingly waives the right to appeal any sentence within the maximum provided in the statutes of conviction, in exchange for the concessions made by the United States in this Plea Agreement. The defendant also waives his right to challenge his sentence or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation.

Appellate and § 2255 waivers identical to the one included Moorehead's plea agreement have been found to be enforceable. *See United States v. Bownes*, 405 F.3d 634, 636 (7th Cir. 2005); *see also* United States v. Lopez, 430 F.3d 854, 856 (7th Cir. 2005). Moorehead's waiver should be enforced.

## <u>Moorehead's Claims Have No Merit</u>

Moorehead has failed to demonstrate that his motion is valid on the merits. Moorehead has not set forth facts sufficient to establish his claim of ineffective assistance of counsel, and his assertions directly contradict his sworn statements at the plea hearing.

Ineffective assistance is shown if erroneous advice caused the guilty plea, and had correct advice been given, the defendant would not have pleaded guilty and would have insisted on going to trial. *See Hill v. Lockhart*, 474 U.S. 52, 58 (1985); *Bethel v. United States*, 458 F.3d 711, 716-717 (7th Cir. 2006). In this instance, Moorehead does not assert that he would have gone to trial if correct advice had been given. Rather he asserts that with effective legal assistance, he would have been able "to plea anew". Def.'s Motion at p.12.

The defendant bears a heavy burden in establishing an ineffective assistance of counsel claim. *See United States v. Moya-Gomez*, 860 F.2d 706, 763 (7th Cir. 1988). In order to establish an ineffective assistance of counsel claim the defendant must show: (1) that his attorney's representation fell below an objective standard of reasonableness (performance prong) and (2) that there exists a reasonable probability that, but for counsel errors, the result of the proceedings would have been different (prejudice prong). *Id. citing Strickland v. Washington*, 466 U.S. 668, 694 (1984). "With regard to the performance prong, the

defendant must identify the specified acts or omissions of counsel that form the basis for his claim of ineffective assistance." *Moya-Gomez*, 860 F.2d at 763-764. "The court must then determine, in light of all the circumstances, the identified acts or omissions that were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  As to the prejudice prong of the inquiry, a "reasonable probability" of a different result means that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Moorehead cannot satisfy either *Strickland* prong.  With regard to performance, Moorehead has failed to identify any specified acts or omissions that were outside the wide range of professionally competent assistance.  With regard to prejudice, Moorehead has not set forth any facts in his motion showing how he was prejudiced.

Vague, conclusory, speculative, or palpably incredible allegations, as well as allegations that contradict the record, can be dismissed without a hearing. *Gallo-Vasquez v. United States*, 402 F.3d 793, 797 (7th Cir. 2005).  In this instance, Moorehead's allegations are vague, conclusory, speculative and incredible.  Moreover, Moorehead's allegations concerning the plea agreement are clearly contradicted by the record.

### Representation by Luis Galvan

Moorehead argues that Galvan was ineffective in negotiating a favorable plea agreement for Moorehead, because the ARDC had filed a Complaint against Galvan. Specifically, Moorehead stated that Galvan "had a Complaint filed against him alleging

8

misconduct...[which] interfered with effective representation," which "led [Moorehead] into accepting a onesided plea agreement." Affidavit at p.3. This argument has no merit because the ARDC did not file the Complaint against Galvan until 8 months after Moorehead pled guilty. Moorehead pled guilty in open court in April 2006. The ARDC filed the Complaint against Galvan in December 2006[4]. The ARDC Complaint could not have affected Galvan's representation of Moorehead during plea negotiations.

Moorehead also argues that Galvan was ineffective because Galvan failed to discuss the facts, the law, and the Guidelines, and Galvan promised that Moorehead would receive probation and/or house arrest. This argument fails, however, because of the plea colloquy.

In general, claims in § 2255 motions that contradict sworn statements made during the plea colloquy cannot support relief, or even call for an evidentiary hearing. *Nunez v. United States*, 495 F.3d 544, 546 (7th Cir. 2007); *United States v. Stewart*, 198 F.3d 984, 986-987 (7th Cir. 1999). During the change of plea, Moorehead stated that he had read the plea agreement. Tr. at p. 10. Moorehead said that he had discussed the plea agreement with his lawyer. *Id.* Moorehead said that he had had enough time to talk to his attorney, and that Moorehead had told his attorney everything that Moorehead knew about the case. *Id. at 6.* He said that no agreements or promises had been made that were not contained in the plea agreement. *Id.* Moorehead said that after he read the plea agreement, he signed it. *Id.*

During the change of plea, the prosecutor recited the factual basis set out in the plea

---

[4] As noted above, the complaint explains that the investigation was opened in November 2006 after the ARDC received a letter raising certain issues. See Def.'s Exh. B (Complaint) at ¶ 10.

agreement, and Moorehead said that those facts were true  Tr. at pp. 14-16.  Thus, Moorehead knew the facts.  Moorehead confirmed that he had agreed that the applicable guideline range was 46 to 57 months.  *Id. at p. 11*.  Thus, Moorehead knew the guidelines. The Court explained to Moorehead that the final sentencing decision would be made by the Court.  *Id.*  Thus, Moorehead knew that Galvan could not guarantee what Moorehead's sentence would be.  Even if deficient performance is shown, prejudice is absent if the judge gave adequate warnings to the defendant during the plea colloquy.  *See United States v. Lundy*, 484 F.3d 480, 485 (7th Cir. 2007); *Bethel v. United States*, 458 F.3d 711, 716-717 (7th Cir. 2006).  This Court gave Moorehead adequate warnings.

Moorehead does not argue that he lied during the plea colloquy.  His assertions in this motion, however, contradict his sworn testimony during the plea colloquy.  Moorehead said in court that he had discussed the plea agreement with his attorney, he had read the plea agreement, he understood that his sentence was undetermined at that time, he could receive a punishment that exceeded what he anticipated, and no one had made any promises to him outside of the plea agreement[5].

Plea proceedings are not to be taken lightly.  *See Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977).  Representations made by a defendant during a change of plea hearing are presumed to be true, and that presumption creates "a formidable barrier in any subsequent

---

[5]  In September 2006, five months after he pled guilty, Moorehead wrote a letter to the Court, which was attached to the Sentencing Memorandum.  See Sentencing Memorandum.  In that letter Moorehead said that Galvan "has done a good job representing me."  Letter at p. 1.  The current motion contradicts Moorehead's statement to the Court.

collateral proceedings." *Id*. at 74.  Although a defendant can overcome the presumption, the defendant must set forth more than conclusory allegations.  *Id*.  The defendant must provide specific details about any alleged promises, including when and where the promises were made, and the context in which they arose.  *See Key v. United States*, 806 F.2d 133, 139 (7th Cir. 1986).  In this case, Moorehead claims that Galvan promised him a sentence of less than 6 months at some indefinite time.  Such a bare assertion is insufficient to rebut the presumptive truth of his contrary statement that he received no promises regarding his sentence from anyone.

Moorehead has also failed to provide more than conclusory statements alleging that Galvan did not discuss the facts, law, and guidelines with Moorehead  These assertions are insufficient to rebut the presumptive truth of Moorehead's contrary statement that he discussed the plea agreement with his attorney[6/].

The plea colloquy provided Moorehead an opportunity to alert the Court to any promises made by his attorney, and to any failure by the attorney to explain the facts and law to Moorehead.  Moorehead gave up his opportunity to alert the Court to any problems at his own risk.  *See United States v. Loutos*, 383 F.3d 615, 619 (7th Cir. 2004); *United States v. Stewart*, 198 F.3d 984, 986 (7th Cir. 1999).   There is no basis to conclude that Galvan's representation during the negotiation of the plea was deficient.

---

[6/]    If Moorehead asserts that he was lying at the change of plea, that would amount to an admission of perjury.  A deliberate fraud carried out on the Court cannot provide an avenue to later render the proceeding a nullity.  *See United States v. Knox,* 287 F.3d 667, 671 (7th Cir. 2002).

## Moorehead's Depression

Moorehead argues that he was depressed at the time that he accepted the plea agreement, and therefore his plea was not knowing and voluntary. This argument has no merit. In fact, the judge found that Moorehead was competent to offer a plea of guilty. Tr. at p.5. Moreover, Moorehead is not arguing that he was incompetent.

The fact that Moorehead may have been depressed does not mean he was incompetent. *See United States v. Clements*, 522 F.3d 790, 795 (7th Cir. 2008)(Defendant was competent, even though he had symptoms of Antisocial Personality Disorder); *United States v. Teague*, 956 F.2d 1427, 1432 (7th Cir. 1992)(Defendant was competent, even though the defendant had "major depression, generalized anxiety disorder and borderline personality disorder."); *United States v. Segal*, 398 F.Supp.2d 912, 915 (N.D. Il. 2005)(The defendant was competent even though he has "a history of ADHD and [was] potentially suffering from obsessive-compulsive disorder, bipolar affective disorder, and recurrent major depressive disorder). Indeed, it is presumed that a criminal defendant is mentally competent to stand trial. *United States v. Morgano*, 39 F.3d 1358, 1373 (7th Cir. 1994)[2/].

Moorehead has failed to provide more than conclusory allegations that he was depressed, and that his depression made his plea involuntary. The Court specifically asked

---

[2/] The U.S. Probation Office's Supplemental Report, which is part of Moorehead's Exhibit A, includes a section entitled "Mental and Emotional Health". The report states that Moorehead's physician "recommended that the defendant participate in counseling (due to stress relating to his pending divorce and the instant offense)." See Exh. A. Supp. Report at p. 2. This indicates that Moorehead was suffering from stress, but it does not indicate that he was incapable of entering into a plea agreement.

Moorehead whether he had been under the care of a doctor or in a hospital for a mental condition, and Moorehead said no. Tr. at p. 5. Although Moorehead may have been depressed, apparently he did not believe that the depression was so serious that he needed to see a doctor or go to a hospital for treatment. The Court stated that Moorehead was competent, and Moorehead failed to raise any issue concerning his mental state. The plea colloquy was Moorehead's opportunity to alert the court to any issues that might exist concerning his depression. Moorehead failed to raise the issue and to alert the Court about this issue at his own risk. *See Loutos*, 383 F.3d at 619. There is no basis to conclude that Moorehead's guilty plea was unknowing or involuntary.

## Representation by Chiphe

Moorehead argues that Chiphe provided ineffective assistance concerning sentencing because he mishandled certain issues concerning the guidelines, and because Chiphe said the issues had been addressed by Galvan. See Affidavit at pp.2-3. This argument has no merit.

Only claims that raise constitutional or jurisdictional issues are cognizable under § 2255. *United States v. Timmerick*, 441 U.S. 780, 783-784 (1979). Errors in Guidelines application do not ordinarily raise constitutional or jurisdictional questions. *See Buggs v. United States*, 153 F.3d 439, 443 (7th Cir. 1998). In this instance, Moorehead stipulated in the plea agreement that the applicable guideline range was 46 to 57 months. He was sentenced near the low end of that guideline range.

Moorehead argues that Imani Chiphe provided ineffective assistance of counsel because Chiphe asserted that Galvan had addressed certain sentencing issues and certain

Guidelines enhancements. Moorehead also asserts that Chiphe could have filed a motion to withdraw the plea agreement. These arguments have no merit.

Chiphe accurately represented that Galvan had addressed the sentencing issues, because Galvan had filed a Sentencing Memorandum which addressed the relevant sentencing issues. See Sentencing Memorandum[8/]. There was no need for Chiphe to file another sentencing memorandum.

Given the factual admissions that Moorehead made in the plea agreement and in court, there was no basis for Chiphe to challenge the guideline enhancements. Moreover, the plea agreement stated that the parties (including Moorehead) agreed on each of the sentencing enhancements identified in the plea agreement.

Moorehead does not assert that he asked Chiphe to withdraw the plea agreement, and a review of the transcript from the change of plea shows that there was no basis for withdrawing the plea. Moorehead has failed to provide more than conclusory allegations claiming that Chiphe provided ineffective assistance to Moorehead. These assertions are insufficient to support Moorehead's motion.

## CONCLUSION

For the foregoing reasons, Moorehead's motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 should be denied without a hearing.

---

[8/] Moorehead complains that he did not get credit for cooperating, but that complaint has no support. At the sentencing, the government made Moorehead's cooperation known to the Court, and the Court sentenced Moorehead near the low end of the guidelines.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney


BY:  ss/Jacqueline Stern
     JACQUELINE STERN
     Assistant United States Attorney
     219 S. Dearborn, Suite 5000
     Chicago, Illinois 60604
     (312) 353-5329

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney certifies that in accordance with FED. R. CIV. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document:

### GOVERNMENT'S RESPONSE TO WILLIAM MOOREHEAD'S
### MOTION UNDER 28 U.S.C. § 2255

was served pursuant to the district court's ECF system as to ECF filers.


ss/Jacqueline Stern

By:    JACQUELINE STERN
       Assistant United States Attorney
       219 S. Dearborn Street
       Chicago, Illinois 60604
       (312) 353-5329

1             IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3  UNITED STATES OF AMERICA,   )
                       )   No.  05 CR546
4          Government,    )
                       )
5  vs.                 )   Chicago, Illinois
                       )
6  WILLIAM MOOREHEAD,      )   April 13, 2006
                       )
7         Defendant.    )   10:44 o'clock a.m.

8

9               TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE JAMES B. ZAGEL
            CHANGE OF PLEA HEARING
10

11  For the Government:

12           THE HONORABLE PATRICK J. FITZGERALD,
            UNITED STATES ATTORNEY
13          BY: Jacqueline O. Stern
               Assistant United States Attorney
14         219 South Dearborn Street
           Suite 500
15         Chicago, Illinois  60604

16

For the Defendant:
17          FEDERAL DEFENDER PROGRAM
           BY:  Luis M. Galvan
18         55 East Monroe Street
           Suite 2800
19         Chicago, Illinois  60603

20

Court Reporter:
21
            Blanca I. Lara, CSR, RPR
22         219 South Dearborn Street
              Room 2504
23         Chicago, Illinois 60604
            (312) 435-5895
24

44AM  25

| | | |
|---|---|---|
| 10:44AM | 1 | THE CLERK:  2005 CR 546, United States versus |
| ..:44AM | 2 | Moorehead. |
| 10:44AM | 3 | MS. STERN:  Good morning, your Honor. |
| 10:44AM | 4 | Jacqueline Stern on behalf of the United States. |
| 10:44AM | 5 | MR. GALVAN:  Luis Galvan on behalf of Mr. Moorehead |
| 10:44AM | 6 | who is before the Court, Judge. |
| 10:44AM | 7 | THE COURT:  What are we here for? |
| 10:44AM | 8 | MR. GALVAN:  Judge, we are prepared to enter a plea |
| 10:44AM | 9 | of guilty if your Honor has time this morning. |
| 10:44AM | 10 | THE COURT:  Let me see the agreement, please. |
| 10:44AM | 11 | MS. STERN:  I have an extra copy. |
| 10:44AM | 12 | (Brief pause.) |
| 10:48AM | 13 | THE COURT:  Paragraph 17, what cooperation are we |
| 10:48AM | 14 | talking about? |
| 10:48AM | 15 | MS. STERN:  Judge, he has cooperated in an unrelated |
| 10:48AM | 16 | case -- |
| 10:48AM | 17 | THE COURT:  Okay. |
| 10:48AM | 18 | MS. STERN:  -- by providing us evidence.  The |
| 10:48AM | 19 | government does not at this point intend to move for a |
| 10:48AM | 20 | downward departure but -- |
| 10:48AM | 21 | THE COURT:  But will tell me whatever it is that he's |
| 10:48AM | 22 | done. |
| 10:48AM | 23 | MS. STERN:  I certainly will, Judge. |
| 10:48AM | 24 | THE COURT:  Okay. |
| 48AM | 25 | MR. GALVAN:  And there is continuing cooperation, |

| | | |
|---|---|---|
| 10:48AM | 1 | Judge. |
| 10:49AM | 2 | THE COURT:  William Moorehead -- |
| 10:49AM | 3 | DEFENDANT MOOREHEAD:  Yes, sir. |
| 10:49AM | 4 | THE COURT:  -- I understand it's your intention to |
| 10:49AM | 5 | offer a plea of guilty.  Before I can accept your plea of |
| 10:49AM | 6 | guilty, I have to determine that you're mentally competent at |
| 10:49AM | 7 | this time, that you've had the assistance of a lawyer, that |
| 10:49AM | 8 | you understand your trial rights, that you understand the |
| 10:49AM | 9 | charges against you, that your plea is voluntary and that |
| 10:49AM | 10 | there is a basis in fact for your plea. |
| 10:49AM | 11 | The way I do this is I put you under oath and I ask |
| 10:49AM | 12 | you some questions.  While I'm asking you the questions, I |
| 10:49AM | 13 | want you to know that you can speak with your lawyer at any |
| 10:49AM | 14 | time before you answer a question.  If you want to interrupt |
| 10:49AM | 15 | the proceedings to confer with your lawyer, I'd be happy to |
| 10:49AM | 16 | let you do that. |
| 10:49AM | 17 | It's very important that you tell me the truth.  If |
| 10:49AM | 18 | you lie to me, if you give any false answers to any of my |
| 10:49AM | 19 | questions you can subject yourself to prosecution for perjury, |
| 10:49AM | 20 | it would be a new and separate crime. |
| 10:49AM | 21 | Finally, in going ahead with this procedure you're |
| 10:49AM | 22 | going to be giving up a right you have.  You have a right not |
| 10:49AM | 23 | to incriminate yourself, but, obviously, if you plead guilty, |
| 10:49AM | 24 | you're going to make an incriminating statement.  So by going |
| 50AM | 25 | ahead with this procedure you are giving up your |

4

| | | |
|---|---|---|
| 10:50AM | 1 | constitutional right of self-incrimination; do you understand |
| 10:50AM | 2 | this? |
| 10:50AM | 3 | THE DEFENDANT:  Yes, sir. |
| 10:50AM | 4 | THE COURT:  Mr. Walker, swear the defendant. |
| 10:50AM | 5 | THE CLERK:  Raise your right hand, sir. |
| 10:50AM | 6 | (Defendant duly sworn.) |
| 10:50AM | 7 | THE COURT:  Would you state your name, please, for |
| 10:50AM | 8 | the record. |
| 10:50AM | 9 | THE WITNESS:  William Moore. |
| 10:50AM | 10 | THE COURT:  And how old are you, are you? |
| 10:50AM | 11 | DEFENDANT MOOREHEAD:  63. |
| 10:50AM | 12 | THE COURT:  Where do you live? |
| 10:50AM | 13 | DEFENDANT MOOREHEAD:  Oak Park. |
| 10:50AM | 14 | THE COURT:  Are you married? |
| 10:50AM | 15 | DEFENDANT MOOREHEAD:  Yes sir. |
| 10:50AM | 16 | THE COURT:  How far did you go in school? |
| 10:50AM | 17 | DEFENDANT MOOREHEAD:  College. |
| 10:50AM | 18 | THE COURT:  What kind of work have you done in the |
| 10:50AM | 19 | last 3 years? |
| 10:50AM | 20 | DEFENDANT MOOREHEAD:  Real estate, property |
| 10:50AM | 21 | management. |
| 10:50AM | 22 | THE COURT:  Are you basically in good physical |
| 10:50AM | 23 | health? |
| 10:50AM | 24 | DEFENDANT MOOREHEAD:  I have some health issues, yes. |
| 50AM | 25 | THE COURT:  Do you take medication or drugs on a |

| 10:50AM | 1 | daily basis? |

10:50AM  1  daily basis?

10:50AM  2  DEFENDANT MOOREHEAD:  Medication on a daily basis.

10:50AM  3  THE COURT:  And what do you take that for?

10:50AM  4  DEFENDANT MOOREHEAD:  I have a heart condition; I

10:50AM  5  have high blood pressure and I'm a diabetic.

10:50AM  6  THE COURT:  Have you taken the same medication for a

10:50AM  7  long period of time?

10:50AM  8  DEFENDANT MOOREHEAD:  Yes, sir.

10:50AM  9  THE COURT:  Have they changed the dosage recently?

10:50AM  10  DEFENDANT MOOREHEAD:  No, sir.

10:50AM  11  THE COURT:  Have you taken any other kind of

10:51AM  12  medication or drug, other than the ones prescribed for you, or

10:51AM  13  any alcoholic drink in the last 24 hours?

10:51AM  14  DEFENDANT MOOREHEAD:  No, sir.

10:51AM  15  THE COURT:  Have you been under the care of a doctor

10:51AM  16  or in a hospital for a mental condition?

10:51AM  17  DEFENDANT MOOREHEAD:  No, sir.

10:51AM  18  THE COURT:  Counsel, do either of you have any doubt

10:51AM  19  as to the defendant's competence to plead at this time?

10:51AM  20  MR. GALVAN:  I do not, Judge.

10:51AM  21  MS. STERN:  No, Judge.

10:51AM  22  THE COURT:  Mr. Moorehead, I find that you are

10:51AM  23  competent to offer a plea of guilty.

10:51AM  24  Tell me the name of the attorney who is representing

51AM  25  you in this case?

| | | |
|---|---|---|
| 10:51AM | 1 | DEFENDANT MOOREHEAD:  Luis Galvan. |
| 10:51AM | 2 | THE COURT:  Have you had enough time to talk to |
| 10:51AM | 3 | Mr. Galvan? |
| 10:51AM | 4 | DEFENDANT MOOREHEAD:  Yes. |
| 10:51AM | 5 | THE COURT:  Have you told Mr. Galvan everything you |
| 10:51AM | 6 | know about the case? |
| 10:51AM | 7 | DEFENDANT MOOREHEAD:  Yes, sir. |
| 10:51AM | 8 | THE COURT:  Are you satisfied with Mr. Galvan's |
| 10:51AM | 9 | advise and efforts on your behalf? |
| 10:51AM | 10 | DEFENDANT MOOREHEAD:  Yes, sir. |
| 10:51AM | 11 | THE COURT:  You received a copy of the criminal |
| 10:51AM | 12 | charges against you previously, is that correct? |
| 10:51AM | 13 | DEFENDANT MOOREHEAD:  Yes, sir. |
| 10:51AM | 14 | THE COURT:  What you're charged with is two counts, |
| 10:51AM | 15 | both of them the same offense, it is called devising mail |
| 10:51AM | 16 | fraud.  Devising and participating in a scheme to defraud and |
| 10:51AM | 17 | to obtain money and property by means of material false and |
| 10:52AM | 18 | fraudulent pretenses and misrepresentations in violation of |
| 10:52AM | 19 | federal law; do you understand that? |
| 10:52AM | 20 | DEFENDANT MOOREHEAD:  Yes, sir. |
| 10:52AM | 21 | THE COURT:  And, specifically, you were engaged in |
| 10:52AM | 22 | property management and it is alleged wrongfully |
| 10:52AM | 23 | misappropriated funds, but the charge against you |
| 10:52AM | 24 | specifically -- actually it's wire fraud, is that you |
| 52AM | 25 | transmitted through the wires an audited financial statement |

| | | |
|---|---|---|
| 10:52AM | 1 | of Grove Parc which contained false statements; you understand |
| 10:52AM | 2 | that's Count 1? |
| 10:52AM | 3 | DEFENDANT MOOREHEAD:  Yes, sir. |
| 10:52AM | 4 | THE COURT:  And you also transmitted by wire another |
| 10:52AM | 5 | project's audit financial statements Evergreen Towers, and |
| 10:52AM | 6 | that, too, contained materially false and fraudulent |
| 10:52AM | 7 | information; do you understand that? |
| 10:52AM | 8 | DEFENDANT MOOREHEAD:  Yes, sir. |
| 10:52AM | 9 | THE COURT:  Okay.  And you have discussed with your |
| 10:52AM | 10 | attorney both of these charges, is that correct? |
| 10:53AM | 11 | DEFENDANT MOOREHEAD:  Yes, sir. |
| 10:53AM | 12 | THE COURT:  Under the constitution and laws of the |
| 10:53AM | 13 | United States you are entitled to have a trial by jury on the |
| 10:53AM | 14 | charges against you; do you understand that? |
| 10:53AM | 15 | DEFENDANT MOOREHEAD:  Yes, sir. |
| 10:53AM | 16 | THE COURT:  You have counsel here to assist you |
| 10:53AM | 17 | today.  If you chose to plead not guilty, you'd have the right |
| 10:53AM | 18 | to his assistance at trial as well.  Your lawyer has been |
| 10:53AM | 19 | appointed to serve as your counsel at trial if you wished to |
| 10:53AM | 20 | proceed to trial; do you understand this? |
| 10:53AM | 21 | DEFENDANT MOOREHEAD:  Yes, Judge. |
| 10:53AM | 22 | THE COURT:  You have the right to plead not guilty; |
| 10:53AM | 23 | do you understand this? |
| 10:53AM | 24 | DEFENDANT MOOREHEAD:  Yes, Judge. |
| 53AM | 25 | THE COURT:  If you plead not guilty, you'd have a |

| | |
|---|---|
| 10:53AM | 1 |
| 10:53AM | 2 |
| 10:53AM | 3 |
| 10:53AM | 4 |
| 10:53AM | 5 |
| 10:53AM | 6 |
| 10:53AM | 7 |
| 10:53AM | 8 |
| 10:53AM | 9 |
| 10:53AM | 10 |
| 10:53AM | 11 |
| 10:53AM | 12 |
| 10:53AM | 13 |
| 10:53AM | 14 |
| 10:53AM | 15 |
| 10:53AM | 16 |
| 10:54AM | 17 |
| 10:54AM | 18 |
| 10:54AM | 19 |
| 10:54AM | 20 |
| 10:54AM | 21 |
| 10:54AM | 22 |
| 10:54AM | 23 |
| 10:54AM | 24 |
| 54AM | 25 |

right to a speedy trial, at which time you'd be able to see and hear all the witnesses called to testify against you, your lawyer would have the right to cross examine each and every one of those witnesses, and you'd be able to use the subpoena power of this court to bring witnesses here to testify on your behalf; do you understand this?

DEFENDANT MOOREHEAD:  Yes, sir.

THE COURT:  If you went to trial, you'd be presumed to be innocent, the government would be required to prove you guilty by using competent evidence to show your guilt beyond a reasonable doubt before you could be found guilty, you would not have to prove that you were innocent; do you understand this?

DEFENDANT MOOREHEAD:  Yes, sir.

THE COURT:  If you went to trial, you would have the right to get up on the witness stand and testify on your own behalf, testify that you were not guilty or simply tell your side of the story, but you'd also have the right to remain silent, not to say a word throughout the trial, and if he chose to remain silent, no inference or suggestion that you were guilty could be drawn from the fact that you did not testify; do you understand this?

DEFENDANT MOOREHEAD:  Yes, sir.

THE COURT:  The trial could be a jury trial or a trial by a judge without a jury.  You would not have a trial

| | |
|---|---|
| 10:54AM | 1 |
| 10:54AM | 2 |
| 10:54AM | 3 |
| 10:54AM | 4 |
| 10:54AM | 5 |
| 10:54AM | 6 |
| 10:54AM | 7 |
| 10:54AM | 8 |
| 10:54AM | 9 |
| 10:54AM | 10 |
| 10:54AM | 11 |
| 10:54AM | 12 |
| 10:54AM | 13 |
| 10:54AM | 14 |
| 10:54AM | 15 |
| 10:54AM | 16 |
| 10:55AM | 17 |
| 10:55AM | 18 |
| 10:55AM | 19 |
| 10:55AM | 20 |
| 10:55AM | 21 |
| 10:55AM | 22 |
| 10:55AM | 23 |
| 10:55AM | 24 |
| 55AM | 25 |

by a judge without a jury unless you personally agreed to that procedure; do you understand this?

DEFENDANT MOOREHEAD:  Yes, sir.

THE COURT:  If you had a jury trial, you would be tried by a jury of 12 persons.  They would be selected from a larger group of individuals whose names were drawn at random from voters lists, you and your lawyer would have the right to exclude anybody from the jury if they were biased against you or otherwise disqualified, and you'd have the right to exclude a certain number of jurors simply because you did not want them to serve on your case; do you understand this?

DEFENDANT MOOREHEAD:  Yes, sir.

THE COURT:  If you had a jury trial, a jury would have to agree unanimously, all 12 would have to agree before they could return any verdict, either guilty or not guilty, and they would have to consider each count against you separately and return a separate verdict.  So the verdicts on the counts could be the same verdict or they could decide one way on one count or another way on another; do you understand this?

DEFENDANT MOOREHEAD:  Yes.

THE COURT:  If you plead guilty, you waive, that is you give up every single one of these trial rights; do you understand this?

DEFENDANT MOOREHEAD:  Yes, sir.

| 10:55AM | 1 | THE COURT: If you plead guilty and I accept your |
|---|---|---|
| 10:55AM | 2 | plea, there's going to be no trial at all, I will enter a |
| 10:55AM | 3 | finding of guilty based on your plea of guilty and then I'll |
| 10:55AM | 4 | sentence you after a sentence hearing; do you understand this? |
| 10:55AM | 5 | DEFENDANT MOOREHEAD: Yes, Judge. |
| 10:55AM | 6 | THE COURT: I'm holding up a written plea agreement. |
| 10:55AM | 7 | You've seen this? |
| 10:55AM | 8 | DEFENDANT MOOREHEAD: Yes, sir. |
| 10:55AM | 9 | THE COURT: And you've read it? |
| 10:55AM | 10 | DEFENDANT MOOREHEAD: Yes, sir. |
| 10:55AM | 11 | THE COURT: And you've discussed it with your lawyer? |
| 10:55AM | 12 | DEFENDANT MOOREHEAD: Yes, sir. |
| ⌐ ·55AM | 13 | THE COURT: Have any agreements or promises been made |
| 10:55AM | 14 | to you that are not contained in this writing? |
| 10:55AM | 15 | DEFENDANT MOOREHEAD: No, sir. |
| 10:55AM | 16 | THE COURT: After you read it, did you sign it where |
| 10:56AM | 17 | I'm pointing? |
| 10:56AM | 18 | DEFENDANT MOOREHEAD: Yes, sir. |
| 10:56AM | 19 | THE COURT: The penalty for each one of these |
| 10:56AM | 20 | offenses is 5 years in prison -- |
| 10:56AM | 21 | 2 to 3 supervised release? |
| 10:56AM | 22 | MS. STERN: 2 but not more than 3, yes, Judge. |
| 10:56AM | 23 | THE COURT: It's a 5 year prison term at the maximum, |
| 10:56AM | 24 | a period of supervised release of 2 to 3 years, any |
| 56AM | 25 | restitution I see fit to order, the maximum fine is ordinarily |

| 10:56AM | 1 | $250,000 but it could be as high as twice the gain, intended |
| 10:56AM | 2 | gain, or twice the loss in this particular case, and in this |
| 10:56AM | 3 | particular case it is possible that the fine would be higher |
| 10:56AM | 4 | than $250,000; do you understand that for each count? |
| 10:56AM | 5 | DEFENDANT MOOREHEAD:  Yes, sir. |
| 10:56AM | 6 | THE COURT:  That means, as a whole, the maximum |
| 10:56AM | 7 | sentence for the counts to which you plead guilty is 10 years |
| 10:56AM | 8 | in prison, a maximum fine of $500,000 or twice the loss or |
| 10:57AM | 9 | gain, supervised release stays the same, 2 to 3 years, and |
| 10:57AM | 10 | restitution stays the same; do you understand that? |
| 10:57AM | 11 | DEFENDANT MOOREHEAD:  Yes, sir. |
| 10:57AM | 12 | THE COURT:  Now, most sentences are not imposed at |
| ·57AM | 13 | the maximum level.  They are imposed within certain |
| 10:57AM | 14 | guidelines.  You and your lawyer and the government have |
| 10:57AM | 15 | agreed the guideline which would probable apply to your case |
| 10:57AM | 16 | would be 46 months at the bottom to 57 months at the top; do |
| 10:57AM | 17 | you understand that? |
| 10:57AM | 18 | DEFENDANT MOOREHEAD:  Yes, sir. |
| 10:57AM | 19 | THE COURT:  And while most sentences are within the |
| 10:57AM | 20 | guideline, I am not required to give you a sentence within the |
| 10:57AM | 21 | guideline.  I could give you a sentence all the way up to the |
| 10:57AM | 22 | top maximum sentence, and I could give you a sentence of no |
| 10:57AM | 23 | custody at all; do you understand that? |
| 10:57AM | 24 | DEFENDANT MOOREHEAD:  Yes, sir. |
| 57AM | 25 | THE COURT:  I want to go over a couple of the terms |

| | |
|---|---|
| 10:57AM | 1 |
| 10:57AM | 2 |
| 10:58AM | 3 |
| 10:58AM | 4 |
| 10:58AM | 5 |
| 10:58AM | 6 |
| 10:58AM | 7 |
| 10:58AM | 8 |
| 10:58AM | 9 |
| 10:58AM | 10 |
| 10:58AM | 11 |
| 10:58AM | 12 |
| 10:58AM | 13 |
| 10:58AM | 14 |
| 10:58AM | 15 |
| 10:58AM | 16 |
| 10:58AM | 17 |
| 10:58AM | 18 |
| 10:58AM | 19 |
| 10:59AM | 20 |
| 10:59AM | 21 |
| 10:59AM | 22 |
| 10:59AM | 23 |
| 10:59AM | 24 |
| 59AM | 25 |

1   of the agreement with you.  The first is, that the time of
2   sentencing the government will tell me the degree to which
3   you've cooperated with the government as they say on an
4   unrelated case, and they're telling me that because certainly
5   there might be a consideration in terms of my giving you a
6   sentence lower than I might otherwise give.  Other than that,
7   both sides are free to recommend whatever sentence they deem
8   appropriate within the applicable guidelines, which means the
9   government is saying that they won't recommend a sentence
10  higher than the guidelines, but you are free to seek a
11  sentence which is lower than the guidelines based on
12  extraordinary family circumstances; do you understand that?
13          DEFENDANT MOOREHEAD:  Yes, sir.
14          THE COURT:  You understand that the recommendations
15  are not binding on me?
16          DEFENDANT MOOREHEAD:  Yes, sir.
17          THE COURT:  It says here that you're agreeing that
18  the amount of restitution that would be paid to the Marion
19  Stamps Memorial Charity Fund is $19,990; do you understand
20  that?
21          DEFENDANT MOOREHEAD:  Yes, sir.
22          THE COURT:  And one other agreement the United States
23  is making, and that is is that they are agreeing not to seek
24  additional criminal charges in this district against you for
25  events between approximately 1994 and August 2002 relating to

| | | |
|---|---|---|
| 10:59AM | 1 | fraudulent taking of funds from the CHA HUD or other property |
| 10:59AM | 2 | owners described above in this plea agreement; do you |
| 10:59AM | 3 | understand that the government is agreeing to do that? |
| 10:59AM | 4 | DEFENDANT MOOREHEAD:  Yes, sir. |
| 10:59AM | 5 | THE COURT:  It also means that if the United States |
| 10:59AM | 6 | Attorney in another district wanted to prosecute you, they |
| 10:59AM | 7 | could; or if there are crimes that are not disclosed in this |
| 10:59AM | 8 | plea agreement or in your statements to the government, they |
| 10:59AM | 9 | can go after you for that; do you understand that? |
| 10:59AM | 10 | DEFENDANT MOOREHEAD:  Yes, sir. |
| 10:59AM | 11 | THE COURT:  Okay.  Has anyone forced you in any way |
| 10:59AM | 12 | to plead agreement? |
| 10:59AM | 13 | DEFENDANT MOOREHEAD:  No. |
| 10:59AM | 14 | THE COURT:  Has anyone threatened you in any way to |
| 11:00AM | 15 | cause you to plead guilty? |
| 11:00AM | 16 | DEFENDANT MOOREHEAD:  No, sir. |
| 11:00AM | 17 | THE COURT:  Apart from the plea agreement, have any |
| 11:00AM | 18 | promises been made to cause you to plead guilty? |
| 11:00AM | 19 | DEFENDANT MOOREHEAD:  No, sir. |
| 11:00AM | 20 | THE COURT:  Is your decision to plead guilty entirely |
| 11:00AM | 21 | voluntary? |
| 11:00AM | 22 | DEFENDANT MOOREHEAD:  Jest. |
| 11:00AM | 23 | THE COURT:  Do you understand that the final decision |
| 11:00AM | 24 | of what your sentence will be rests with me? |
| 00AM | 25 | DEFENDANT MOOREHEAD:  Yes, sir. |

| | | |
|---|---|---|
| 11:00AM | 1 | THE COURT:  Would the government please summarize |
| 11:00AM | 2 | what its evidence would be with respect to Counts 1 or 2 if |
| 11:00AM | 3 | this case were tried. |
| 11:00AM | 4 | MS. STERN:  Judge, the evidence would include |
| 11:00AM | 5 | financial records, business records, bank records, audits, HUD |
| 11:00AM | 6 | records, CHA records, a handwriting expert, employees who |
| 11:00AM | 7 | worked for Mr. Moorehead, associates of Mr. Moorehead, and |
| 11:00AM | 8 | other witnesses. |
| 11:00AM | 9 | The evidence would show that between 1994 and 2002, |
| 11:00AM | 10 | Mr. Moorehead and others knowingly and intentionally devised |
| 11:00AM | 11 | and participated in a scheme to defraud and to obtain money |
| 11:00AM | 12 | and property form HUD, CHA, and other property owners by means |
| 11:00AM | 13 | of materially false and fraudulent pretenses, representations |
| 11:00AM | 14 | and promises, and by means of material omissions. |
| 11:00AM | 15 | The evidence would show Mr. Moorehead was the |
| 11:00AM | 16 | president of a property management company known as Moorehead |
| 11:01AM | 17 | & Associates, and that Mr. Moorehead and other acting at his |
| 11:01AM | 18 | direction, specifically Brian Townsend and Patricia Taylor, |
| 11:01AM | 19 | misappropriated almost one million dollars, at least $995,000 |
| 11:01AM | 20 | from projects that the company was managing, as well as |
| 11:01AM | 21 | Mr. Moorehead taking money from the Marion Stamps Charity |
| 11:01AM | 22 | Fund. |
| 11:01AM | 23 | The evidence would show that Mr. Moorehead and others |
| 11:01AM | 24 | at his direction made false representations to auditors and |
| 01AM | 25 | others, inflated certain bank accounts by depositing worthless |

11:01AM 1 checks, filed inaccurate monthly reports, created false

11:01AM 2 records, including false bank statements, false ledgers, false

11:01AM 3 bank reconciliations and false invoices.

11:01AM 4      The evidence would show that Mr. Moorehead falsely

11:01AM 5 represented to CHA and HuD and other owners that he would

11:01AM 6 protect the funds that were entrusted to his company, that he

11:01AM 7 and his company would use the funds for only legitimate

11:01AM 8 authorized purposes, that they would maintain true and

11:01AM 9 accurate financial records, that they would provide accurate

11:02AM 10 audited financial statements in true and accurate monthly

11:02AM 11 reports.

11:02AM 12      The evidence would show that Mr. Moorehead took money

11:02AM 13 from more than a dozen projects and took more than $300,000

11:02AM 14 from the charity fund.  That Mr. Moorehead and others at his

11:02AM 15 direction created false invoices and checks, false bank

11:02AM 16 statements, bank reconciliations, check ledgers, records

11:02AM 17 relating to the TUF credit Union, including bank confirmations

11:02AM 18 and financial records, as well as creating falsely inflated

11:02AM 19 bank account statements, and that on one occasion 7 NSF checks

11:02AM 20 totaling approximately 239,000 were drawn on an account that

11:02AM 21 only had 5 cents in it.

11:02AM 22      The evidence would show that Mr. Moorehead and

11:02AM 23 Patricia Taylor and Brian Townsend maintained two sets of

11:02AM 24 financial records for Grove Parc and other projects, and that

03AM 25 Mr. Moorehead caused the submission to HUD of certain monthly

| | | |
|---|---|---|
| 11:03AM | 1 | reports and audited financial statements. |
| 11:03AM | 2 | And specifically in terms of the wires, as you've |
| 11:03AM | 3 | already said, Judge, that on or about November 16th, 2000, |
| 11:03AM | 4 | Mr. Moorehead, together with Townsend and Taylor, for the |
| 11:03AM | 5 | purpose of executing the above described scheme knowingly |
| 11:03AM | 6 | caused to be transmitted in interstate commerce from Chicago |
| 11:03AM | 7 | to Washington, D.C., an electronic transmission of an audited |
| 11:03AM | 8 | financial statement for Grove Parc Plaza which contained false |
| 11:03AM | 9 | representations. |
| 11:03AM | 10 | And that on or about September 17th, 2002, |
| 11:03AM | 11 | Mr. Moorehead caused to be transmitted electronically from |
| 11:03AM | 12 | Chicago to Washington, D.C., a financial statement for |
| 11:03AM | 13 | Evergreen Tower for the calendar year 2000, which also |
| 11:03AM | 14 | contained false information. |
| 11:03AM | 15 | THE COURT:  Did you just hear what the prosecutor had |
| 11:03AM | 16 | to say? |
| 11:03AM | 17 | DEFENDANT MOOREHEAD:  Yes, sir. |
| 11:03AM | 18 | THE COURT:  Is what she said the truth? |
| 11:04AM | 19 | DEFENDANT MOOREHEAD:  Yes, sir. |
| 11:04AM | 20 | THE COURT:  'Mr. Moorehead, what is your plea to |
| 11:04AM | 21 | Count 1? |
| 11:04AM | 22 | DEFENDANT MOOREHEAD:  I violated my contract with -- |
| 11:04AM | 23 | THE COURT:  What's your plea? |
| 11:04AM | 24 | DEFENDANT MOOREHEAD:  Oh, I plead guilty. |
| 04AM | 25 | THE COURT:  There are only two things you can say, |

| | | |
|---|---|---|
| 11:04AM | 1 | guilty or not guilty. |
| 11:04AM | 2 | DEFENDANT MOOREHEAD:  Oh, I'm sorry. |
| 11:04AM | 3 | THE COURT:  So let me ask you, what is your plea to |
| 11:04AM | 4 | Count 1? |
| 11:04AM | 5 | DEFENDANT MOOREHEAD:  Guilty. |
| 11:04AM | 6 | THE COURT:  And what is your plea to Count 2? |
| 11:04AM | 7 | DEFENDANT MOOREHEAD:  Guilty. |
| 11:04AM | 8 | THE COURT:  Mr. Moorehead, since you've acknowledged |
| 11:04AM | 9 | that you are, in fact, guilty as charged in Counts 1 and 2, |
| 11:04AM | 10 | you've had the assistance of counsel, you know your trial |
| 11:04AM | 11 | rights, you know the maximum possible punishment as you are |
| 11:04AM | 12 | voluntarily pleading guilty, I will accept your plea of guilty |
| 11:04AM | 13 | and enter judgment of guilty on your plea. |
| 11:04AM | 14 | I will order a presentence investigation.  Your |
| 11:04AM | 15 | lawyer will explain the process to you.  There will be a |
| 11:04AM | 16 | report prepared about this offense and about you.  You'll have |
| 11:04AM | 17 | a chance to see it before I do and a chance to correct any |
| 11:04AM | 18 | mistake you think are in the report. |
| 11:04AM | 19 | At the time I sentence you, your lawyer will make |
| 11:04AM | 20 | arguments on your behalf, the prosecutor will speak also, |
| 11:04AM | 21 | usually the last thing I hear is anything you want to say to |
| 11:05AM | 22 | me yourself.  I tell you this now so you can think about what |
| 11:05AM | 23 | it is, if anything, you want to say to me.  I also tell you |
| 11:05AM | 24 | that if you do not choose to speak on your own behalf, I will |
| 05AM | 25 | not hold it against you. |

| | | |
|---|---|---|
| 11:05AM | 1 | Present bond to stand, the matter is continued for |
| 11:05AM | 2 | disposition at 2:00 p.m. on? |
| 11:05AM | 3 | THE CLERK:  June 22nd. |
| 11:05AM | 4 | MS. STERN:  Thank you very much, your Honor. |
| 11:05AM | 5 | MR. GALVAN:  Thank you, Judge. |
| 11:05AM | 6 | THE COURT:  THE COURT:  Thank you, counsel. |
| | 7 | |
| | 8 | *    *    *    *    *    *    *    * |
| | 9 | |
| | 10 | |
| | 11 | I, BLANCA I. LARA, DO CERTIFY THAT THE FOREGOING IS A CORRECT |
| | 12 | TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE |
| | 13 | ABOVE-ENTITLED MATTER. |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | Blanca I. Lara                              Date |
| 11:05AM | 20 | |
| 11:05AM | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **No.  05 CR 546-1** |
| v. | ) | **Judge James B. Zagel** |
| | ) | |
| WILLIAM MOOREHEAD | ) | |

SENTENCING MEMORANDUM

Defendant WILLIAM MOOREHEAD, by the FEDERAL DEFENDER PROGRAM and

its attorney, LUIS M. GALVAN, respectfully requests, pursuant to United States v. Booker, 125

S.Ct. 738 (2005), and 18 U.S.C. § 3553(a), that this Honorable Court sentence him to a term of

probation or home detention with additional conditions. In support of this motion, Mr.

Moorehead states as follows:

I.   **Background and Sentencing Recommendation**

On April 13, 2006, in a plea agreement between the United States Attorney's Office and

William Moorehead, Mr. Moorehead entered a plea of guilty to two counts of devising and

participating in a scheme to defraud and to obtain money and property by means of material false

and fraudulent pretenses and misrepresentations in violation of 18 U.S.C. §§ 1343 and 2.  In

addition, Mr. Moorehead acknowledges that pursuant to 18 U.S.C. § 3663(a), the Court must

order him to make restitution in the amount of $19, 991, which is due and owing as it relates to

the Marion Stamps Memorial Charity Fund. Further, Mr. Moorehead understands that in ordering

restitution, if any, as set forth in 18 U.S.C. § 3663A (c)(3)(B) as it relates to the properties

managed by himself and his company would raise complex issues of fact that would unduly complicate and prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process. The calculation, if any, would involve the very time-consuming review of a large number of transactions, invoices, and bank records.

Under guideline § 2B1.1 the base offense level is 6. After adjustments, Mr. Moorehead's base offense level is 23. His criminal history category is I. Based on an offense level of 23 and a criminal history category of I, the advisory guideline range for imprisonment is 46 to 57 months.

Mr. Moorehead now stands before this Court for sentencing and respectfully submits this memorandum in order to provide information to assist this Court in fashioning a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C. § 3553(a) in light of United States v. Booker, 125 S.Ct. 738 (2005).

## II.    Legal Basis

Booker established that United States Sentencing Guidelines are merely "advisory," and that sentencing courts are required to consider all of the factors listed in 18 U.S.C. § 3553(a) in imposing sentence. Booker, 125 S.Ct. 738, 757 (2005). In effect, Booker clarified that the sentencing guidelines are simply one of several factors a court must consider in sentencing a defendant. Id. at 764.

With respect to 18 U.S.C. § 3553(a), Booker established a new, independent limit on the sentence that may be imposed on a defendant. The primary sentencing mandate of § 3553(a)

states that courts must impose a sentence that is "sufficient but not greater than necessary, to comply with" the purposes of sentencing which are justice, deterrence, the need to protect society, and rehabilitation of the defendant. Id. at 765. To do so, a court in imposing sentence shall consider:

> the nature and circumstances of the offense, § 3553(a)(1);
>
> the history and characteristics of the defendant, § 3553(a)(1);
>
> * the kinds of sentences available, § 3553(a)(3)
>
> * pertinent Sentencing Commission policy statements, § 3553(a)(5)
>
> * the need to avoid unwarranted sentencing disparities, § 3553(a)(6)
>
> the need to provide restitution to any victims of the offense, § 3553(a)(7).

Significantly, Booker emphasizes that under the Sentencing Reform Act "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Booker, 125 S.Ct at 760 (quoting 18 U.S.C. § 3361).

The Seventh Circuit has held that Booker requires district courts to consider the factors set forth in 18 U.S.C. § 3553(a) when sentencing defendants under the advisory guidelines. United States v. Dean, 414 F.3d 725, 729 (7th Cir. 2005) ("Section 3553(a), unlike the guidelines themselves after Booker, is mandatory.")(citing Booker, 125 S.Ct. at 764-65); United States v.

Cunningham, 429 F.3d 673, 676 (7th Cir. 2005)(explaining that § 3553(a) is "a directive to the sentencing court"). Thus, if the defendant raises § 3553(a) factors in requesting a below-guideline sentence, the court is required to conduct an analysis of how those § 3553(a) factors apply to the facts, and to explain why a particular sentence is appropriate under § 3553(a). Id. at 675-76. The Seventh Circuit will therefore scrutinize a district court's refusal to grant a reduction below the advisory guideline range. United States v. Vaughn, 433 F.3d 917, 924 (7th Cir. 2006). Moreover, "there is no presumption of unreasonableness that attaches to a sentence that varies from the range." United States v. Jordan, 435 F.3d 693, 698 (7th Cir. 2006)(emphasis in original). In fact, the Seventh Circuit has held that the sentencing judge "cannot treat all sentences that would fall within the guidelines sentencing range as reasonable per se." Cunningham, 429 F.3d at 676.

Accordingly, this Court has the discretion to sentence Mr. Moorehead anywhere within the statutory range so long as the sentence is not "unreasonable" in light of the § 3553(a) factors. See generally Booker, 2005 LEXIS 628, at *71-76; see also United States v. Hughes, 2005 U.S. App. LEXIS, at *10 (4th Cir. Jan. 24, 2005)(holding that after Booker, "the discretion of a sentencing court is no longer bound by the range prescribed by the guidelines.") Alternatively, this Court may sentence Mr. Moorehead outside of the Guideline range without establishing that he meets any traditional departure grounds. See, e.g., United States v. Jones, 2005 U.S. Dist. LEXIS 833, at *9 (D. Me. Jan. 21, 2005)("review[ing] the sentencing factors in 18 U.S.C. § 3553(a) in determining whether to apply the now advisory Guidelines, and ultimately sentencing the defendant below the Guideline range for reasons that would not warrant a departure.")

## III.    Section 3553(a) Sentencing Factors as Applied to William Moorehead

A.    The Nature and Circumstances of the Offense

In a plea agreement with the United States Attorney's Office, Mr. Moorehead entered a plea of guilty to defraud the Department of Housing and Urban Development ("HUD"), the Chicago Housing Authority ("CHA"), and other property owners. Mr. Moorehead admitted that he made a huge mistake and is deeply remorseful for his conduct. As Mr. Moorehead states in his letter to the Court, "I did co-mingle funds by using funds from one project to another and covering it up without approval...I know what I did was wrong but it was not to intentionally hurt anyone, it was very bad business practice and a way to keep cash flow for the projects." However, while Mr. Moorehead fully acknowledges the illegality of his conduct, the unusual facts of this case remain an important consideration in assessing the nature of the offense, his culpability, and determining his sentence.

Interestingly, this case presents a unique regulatory backdrop with respect to Mr. Moorehead's property management services to housing projects. Generally, the housing projects were funded by the HUD and CHA. Moorehead and Associates were required to keep record of all activity related to the projects and then submit the records to HUD and CHA for funding. In turn, HUD and CHA dispersed funds to Moorehead and Associates to be used for each project separately. However, as stated by Mr. Moorehead, there were times when Moorehead and Associates would not receive funds from either agency on time to pay the expenses required to operate the projects. In fact, it sometimes took over 90 days to receive the monies. In the mean time, Mr. Moorehead had to meet payroll and pay the operating expenses of the buildings so that the tenants would have heat and running water.

5

In order to pay these expenses, Mr. Moorehead transferred funds from one development to another, used his personal money, or borrowed funds from his company. When the funds came in for a particular project, the money borrowed from a development would be immediately paid back. On one occasion, Mr. Moorehead used his personal money - over $190,000 - to pay contractors for work performed at one development. Also, Mr. Moorehead had to advance monies to projects from his company to meet payroll, so employees of the buildings would get paid on time. Moorehead and Associates was subsequently reimbursed when the funds became available.

Considering the unique circumstances presented here, respectfully, the offense conduct overstates the seriousness of Mr. Moorehead's offense. As stated earlier, Mr. Moorehead did not set out to purposely hurt or defraud anyone. Rather, as explained by Mr. Moorehead, it was a "very bad business practice and a way to keep cash flow for the projects."

Notably, Mr. Moorehead cooperated extensively with the government. For this, he received a 2 point downward adjustment to his offense level for acceptance of responsibility and a 1 point adjustment for timely notification. Should this cooperation prove fruitful for future prosecutions there will be further downward adjustments for Mr. Moorehead. Regarding restitution, Mr. Moorehead is still a partner in a business interest that owns real estate in an area that is valuable property. The property value is expected to prosper as it becomes more sought after by future investors. Therefore, in this case, the possibility of full restitution is a virtual certainty. Other factors worth considering are that Mr. Moorehead's offense did not involve drugs or violence and he does not pose a threat to the public.

6

B.    History and Characteristics of William Moorehead

In May 1962, Mr. Moorehead graduated from Broadstreet High School in Greenwood Missippi. He attended Jackson State University in Jackson, Mississippi and Loop College (now Harold Washington College) in Chicago, Illinois during the mid-1960s. He did not earn a degree from these colleges, but he did earn a bachelor of science degree with a major in urban studies in 1976 from De Paul University in Chicago, Illinois. Mr. Moorehead has a valid real estate broker's license and a certificate in property management. He specializes in training in real estate and property management.

Mr. Moorehead has over 150 cumulative years of dedicated volunteer work and service to the community. He is instrumental in providing low income housing for hundreds of families as well as implementing health care access, job training and employment for the underprivileged. As a result of his dedication to the community, Mr. Moorehead has received the Human Relations Award from the city of Chicago, the National Association of Community Health Centers Award, and the Illinois Primary Health Care Association honored him with the Consumer Board Dedication Award. Also, the community celebrated Mr. Moorehead's contribution to society by renaming a section of Cleveland Avenue in Chicago to "William Moorehead Street."

Mr. Moorehead's contributions to the community can hardly be ignored. For instance, as a charter member and president of the Near North Development Coporation, he advanced the development of housing for low to moderate income families and senior citizens on the near north side of Chicago. As a LEED council member, he worked to keep jobs in Chicago and provided job training for residents of Cabrini Green and Near North side housing developments.

In 1982, with the help of Northwestern Hospital, Children's Memorial Hospital and the community, Mr. Moorehead assisted in establishing the Near North Health Services Corporation. As chairman of this program he was able to provide health care to the poor and under served. His company, William Moorehead and Associates, worked with the Earn-Fare Program to provide jobs and job training to welfare recipients. He also developed the Resident Initiative Program for Public Housing, which provided social services, life skills, and computer training to residents in various housing developments.

Impressively, Mr. Moorehead's passion is not only reflected in the community, but it is shown throughout his life. He is 63 years old. He has never used drugs and he does not have a history of substance abuse. He was married to Verdie Moorehead from 1964 until 1994. Their marriage produced four children: William Moorehead, Jr. is 41 years old, Timothy and Donald Moorehead are 35 years old, and Maurice Moorehead is 33 years old. Mr. Moorehead has seven grandchildren who all live in Chicago, Illinois. Mr. Moorehead's oldest son, William Moorehead Jr. has four children who live with Verdie. Their ages range from 13 - 18 years of age. The children live with Verdie, because William Moorehead Jr. has a drug problem that has kept him incarcerated in the Cook County Department of Correction.

Mr. Moorehead married his second wife, Mia Moorehead in December 1996 in Oak Park Illinois. Their union produced no children, but Mr. Moorehead adopted Mia's son from a previous marriage. His son's name is Jimmie Moorehead and he is 18 years old. As a result of this case, Mia Moorehead filed for divorce from Mr. Moorehead. They are sharing custody of their son, but Jimmie lives with Mr. Moorehead and attends college.

It is important to understand Mr. Moorehead's value in his family's life. His son,

Maurice, suffers from brain damage and asthma that is a result from complications at birth. The doctors did not properly monitor Verdie's progress during labor. As a result, Maurice was deprived of oxygen for too long, which caused brain damage. Maurice is 33 years old, but his mind functions at the level of a 3 year old child. While he is emotionally responsive, he cannot speak, cook or be left alone. He cannot support himself independently. Maurice lives with his mother, Verdie, Mondays through Fridays. He lives with Mr. Moorehead Fridays through Sundays. Verdie and Mr. Moorehead share the responsibility of transporting Maurice to school at a center run by the Chicago Association for Retarded Citizens.

In addition to his severe developmental disability, Maurice has a history of suffering from various ailments. He has Keloids, which is a skin disease. He has surgery to have these removed every 2 - 3 years. In addition, he has suffered from multiple hernias. Approximately ten years ago, Maurice had his first surgery for a hernia. On September 20, 2006, he went through surgery for a double hernia. Mr. Moorehead brings Maurice to the hospital for every surgery and is waiting at the bedside for his son to wake up each time.

Mr. Moorehead has been essential to Maurice's development. He has taught Maurice the practical functions of living day to day, such as bathing and dressing. Mr. Moorehead brings Maurice to his grandchildren's football games, they go for walks, attend movies, go out for dinner and participate every Sunday at church. Mr. Moorehead has been vital to addressing Maurice's healthcare needs. Before this case forced Mr. Moorehead to leave his job, he spent $4,000 per month for Maurice's medical expenses that his insurance would not cover. However, without a job, Mr. Moorehead has no earning capacity. Therefore, approximately four months ago, Mr. Moorehead was forced to place Maurice on Medicaid. Mr. Moorehead still pays

9

relatively $300 per month that Medicaid cannot cover.

The grandchildren who live with Verdie love Maurice, but they cannot provide the necessities that Mr. Moorehead gives to him. They are too young to be able to financially provide for Maurice, they do not drive a car, and they will be attending college in the future. Mr. Moorehead's other children cannot provide for Maurice, because of their own children and families they need to support.

Mr. Moorehead's responsibility as care giver for Maurice warrants a sentence of probation or home detention. In fact, sentencing Mr. Moorehead within the guideline range would have a devastating impact on the Moorehead family and the community.

First, should Mr. Moorehead be incarcerated, the immediate impact would be that both Maurice and Jimmie would lose the indispensable parental support, nurture, and love that Mr. Moorehead has provided throughout their lives. It is a testimony to Mr. Moorehead's child rearing ability that his son, Maurice, has made positive physical and emotional progress since his birth. Clearly, Mr. Moorehead's exceptional care-giving capacities plays an important part in his family's lives. To deprive the family of their father so suddenly and without their ability to comprehend this result, would certainly have a devastating impact on them.

Secondly, the family would also lose Mr. Moorehead's income. Verdie Moorehead does not work. She is still raising her four grandchildren. At her age, it is difficult to find a job that can provide the support that is necessary for five children, especially for a child with a developmental disability. It is not feasible to hire a care giver to provide for Maurice's special needs, because there is no income. Maurice may digress physically and emotionally if not provided consistent care or individualized attention.

10

Also, the community would benefit from Mr. Moorehead receiving a sentence of probation or home detention. He has consistently proven to be an instrument for the underprivileged receiving housing, job training and healthcare. Further, his son is forced to be put on Medicaid, which adds to the billions of dollars already spent by Illinois on the program. The proposed cuts to Medicaid could have a devastating impact on Maurice and his family. By providing for Maurice, Mr. Moorehead could supplement Maurice and prevent a burden to the Medicaid program.

Mr. Moorehead and Verdie are getting older. Mr. Moorehead needs to spend as much of his time the court will grant him towards earning and saving money, so Maurice can use it towards his medical and daily living expenses. Allowing Mr. Moorehead provide for his family will benefit them and the community.

Considering the greater harm that the Moorehead family would suffer, given that a sentence of probation or home detention is available, incarcerating Mr. Moorehead is not necessary to achieve the goals of punishment.

C.   The Kinds of Sentences Available

Because the guidelines are now advisory, this Court can sentence Mr. Moorehead to any reasonable sentence. Mr. Moorehead's applicable sentence lies in Zone D of the Sentencing Table. Under the guidelines, with an offense level of 23 and a criminal history category of I, Mr. Moorehead may be sentenced from 46 to 57 months and would not be eligible for probation. However, because the Sentencing Guidelines are no longer binding, courts have discretion to impose probation, home confinement, or a split sentence even when the defendant falls with Zone D of the Sentencing Table. Many courts have done precisely this. See, e.g., United States

11

Jones, 352 F. Supp. 2d 22, 25 (D. Maine 2005 ) (varying from guidelines to impose sentence of home detention despite the fact that departure under sentencing guidelines not warranted.); United States v. Kelly, 355 F. Supp. 2d 1031 (D. Neb. 2005)(sentence of home detention); United States v. Neimoeller, No. 02-09-CR-1, 2005 WL 1799456 (S.D. Ind. July 15, 2005)(same); United States v. Anderson, 365 F. Supp. 2d 67 (D. Maine2005)(split sentence) Accordingly in this case, probation, home detention, work release or a split sentence involving home detention with work dedicated to a volunteer low-income housing organization is available to this Court. Under § 3553(a), this Court must consider these options in determining a sentence that is "sufficient but not greater than necessary" to achieve the goals of punishment.

            D.      The Sentencing Guideline Range

In a written plea agreement with the United States Attorney's Office, Mr. Moorehead entered a plea of guilty to two counts of devising and participating in a scheme to defraud and to obtain money and property by means of material false and fraudulent pretenses and misrepresentations. In addition, Mr. Moorehead acknowledges that the Court must order him to make restitution in the amount of $19, 991, which is due and owing as it relates to the Marion Stamps Memorial Charity Fund. The written plea agreement outlines the application of the sentencing guidelines based on a scheme to defraud and obtain money and property by means of material false and fraudulent pretenses. Under §2B1.1, the base offense level for this loss is 6. However, after adjustments including acceptance of responsibility and cooperation, Mr. Moorehead's base offense level is 23. Together with a criminal history category of I, the advisory guideline range for imprisonment is 46 to 57 months.

F.    Public Policy

While the Court cannot ignore the culpability of Mr. Moorehead, it cannot discount society's interest in stable families. Accordingly, it is much better that Mr. Moorehead be sentenced to probation, work release or home detention, so that he can continue to support his family financially as well as provide nurture and care to his children.

Markedly, the Chicago Health and Disability Advocates point out that family support and cohesion are instrumental in a sustainable community. Chicago Health and Disability Advocates, Medical Assistance Action Plan: Illinois Medical Program Outline and Blue Print for Action (2003). Illinois is recognizing the need for families with disabled children to have a strong support network. Programs are geared towards placing decision making controls in the hands of the family and provide them with greater flexibility without placing a heavy financial burden on the family as well as the community. Chicago Health and Disability Advocates, Medical Assistance Action Plan: Illinois Medical Program Outline and Blue Print for Action (2003).

IV.    **A Sentence of Probation or Home Detention with Community Service Work Dedicated to a Low Income Housing Organization Satisfies the Goals of Punishment under 18 U.S.C. § 3553(a).**

Both the Supreme Court and Seventh Circuit law authorize this Court to impose a sentence below the advisory guideline range as long as that sentence conforms with the § 3553(a) factors. A sentence of probation or home detention with community service work dedicated to a low-income housing organization is "sufficient but not greater than necessary," to achieve the

statutory purposes of punishment which are justice, deterrence, protection of society, and rehabilitation of the defendant. Booker, 125 S.Ct. 738 (2005.

First, justice is certainly served by this proposed sentence. Mr. Moorehead recognizes the seriousness of his offense and the resulting harm warrants imprisonment. However, justice would be better served by sentencing Mr. Moorehead to probation, work release or home detention with a condition of voluntary community service dedicated to assisting in the management of low-income housing. Mr. Moorehead may do this by participating in the Housing Abandonment Task Force, which is a city-wide coalition of neighborhood organizations. In addition, Mr. Moorehead may also be sentenced to assist Katrina victims in restoration of their housing affairs, such as property and financial management.

Second, the humiliating experience of being convicted of a federal crime has given Mr. Moorehead a deep respect for the law. Additionally, Mr. Moorehead now fully understands the extent to which he has jeopardized the future of his family by placing himself in a position where he may be incarcerated for an extended period of time. This knowledge is a powerful deterrent to any further wrongdoing.

Third, while protection of society and rehabilitation are minor considerations in this case, given the above examinations, Mr. Moorehead presents no risk of recidivism.

Fourth, it should be noted that Mr. Moorehead has had only one prior state conviction from the 1970s. Mr. Moorehead has not convicted of a crime for over 20 years. With this in mind, the Court can trust that Mr. Moorehead will comply with orders issued by the Court.

14

## V.   Conclusion

In determining a minimally sufficient sentence, the Court must ask whether a more severe sentence would achieve greater justice, deterrence, incapacitation, or rehabilitation. Respectfully, it would not in this case. Indeed, because a sentence within the original guideline range will not serve the needs of the public any better than the proposed sentence, such a sentence is greater than necessary under § 3553(a).

For the foregoing reasons, Mr. Moorehead respectfully requests that this Court impose a sentence of probation, work release or home detention with community service work dedicated to a volunteer management for low-income housing organization.

Respectfully Submitted,

FEDERAL DEFENDER PROGRAM
Terrence F. MacCarthy
Executive Director,

By: _____

Luis M. Galvan

LUIS M. GALVAN
FEDERAL DEFENDER PROGRAM
55 E. Monroe Street, Suite 2800
Chicago, IL 60603
313-621-8352

15

## CERTIFICATE OF SERVICE

The undersigned, Luis M. Galvan, an attorney with the Federal Defender Program, hereby certifies that the following document(s):

SENTENCING MEMORANDUM

was served on September 26, 2006, in accordance with FED.R.CIV.P.5, LR5.5, and the General Order on Electronic Case Filing (ECF), pursuant to the district court's ECF system as to ECF filers, and if any, were sent by first-class mail or by hand delivery to non-ECF filers.

By:     s/Luis M. Galvan
        LUIS M. GALVAN
        FEDERAL DEFENDER PROGRAM
        55 East Monroe Street, Suite 2800
        Chicago, IL 60603
        312\621-8352

# Attachment
## Moorehead's Letter to the Court

The Honorable Judge James B. Zagel
Everett McKinley Dirksen Building
219 S. Dearborn Street, Room 2503
Chicago, IL 60604

Dear Judge Zagel:

Thank you for this opportunity to present my side as to what happened in this case. During the five years that the investigation was going on, no one asked me what really happened, not to even my previous private attorney who represented me for three years and the day before I was indicted he dropped me as a client stating that I could not afford to pay them and leaving me without any representation. However, one of the lawyers in the firm referred me to Luis Galvan who agreed to take me on as a client and who has done a good job representing me.

You honor, I want to make it very clear what I did was wrong. I violated my contracts and the trust of my clients. I did co-mingle funds by using funds form one project to another and covering it up without approval. The monies were always put back. I also used my own funds into these projects from time to time. What really happened was over the past ten years we managed subsidized and public housing for the Chicago Housing Authority and private owners. During this time there were times we would not receive funds from C.H.A to pay the expenses of the operation of these buildings. Sometimes it took over 90 days yet I still had to meet payroll and the operating expense of the buildings, so tenants would have the bare necessities, a safe place to live with heat and running water. On one occasion in 2001 when I used my own money (over $190,000.00) to pay contractors for work performed at one development I wasn't reimbursed for TEN months. On many occasions the properties did not have money to operate

so I would transfer funds from one development to another but when the money came in I would put it back into the account. On many occasions I advanced monies to the projects from my company to meet their payroll so those employees of the buildings would get paid on time. I would reimburse my company when the funds became available.

I know what I did was wrong but it was not to intentionally hurt anyone, it was a very bad business practice and a way to keep cash flow for the projects.

I am not a person who takes from others. I am not now and have never been. I have worked hard all of my life from the time I was seven years old in the cotton fields of Mississippi up until now at the age of 63. My mother taught me to work hard and help others and that's what I have been doing. Over the past forty years I have committed my life to helping others. I have worked through several organizations in this city to provide affordable housing to more than 378 families and Senior through the near north corporation. I have worked and volunteered to provide health care to the under served through the Near North Health Service Corporation for the past 24 years as chairman of the Board of Directors. I served on the board of Directors for the New City YMCA for over seventeen years and the Chicago Council on Urban Affairs for over fifteen years and have volunteered and served in many other capacities. I have spent my entire adult life working to help others better our community and other peoples lives.

In reference to Marion Stamps Youth Center, this organization started out as the Tranquility Marksman Community Organization in the 1979's. Marion Stamps wanted to purchase a building at Clybourn and Division Street to start providing Social Services and other programs to the Near North and Cabrini Green community. She came to me and I loaned her the money as the down payment and again around 1988 they were about to loose the building for non payment of real estate taxes and I loaned them another $23,000, to pay the taxes and save the

building. In 1994 I paid another $4,000 to repair the heating system.

I have cooperated in very way possible in this case and it has dragged on for more than five years. It has destroyed my family and my business because people think that I can't be trusted even though I have given my life to serving other. I plead guilty to the case in 2004 to get the case behind me so that I could rebuild my life again at age 63. I also have to start rebuilding the trust that I destroyed. All of which I have lost due to this investigation and my health has also deteriorated over the last few years.

Your Honor, I have a 33 year old severely handicapped son who can't and never will be able to take care of himself or support himself. I also have a 17 year old son who has a learning disability and is in the process of graduating form high school this year. He needs my guidance and discipline to help him succeed.

I put myself at the mercy of the court and I pray that you will grant me that opportunity by giving me a compassionate sentence.

Sincerely,


William Moorehead

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) 05 CR 546-1 |
| vs. | ) |
| | ) Judge James B. Zagel |
| WILLIAM MOOREHEAD | ) |

NOTICE OF FILING

TO:   Jacqueline Stern
      Assistant United States Attorney
      219 S. Dearborn St., 5th Floor
      Chicago, IL 60604

        Please take notice that on this 26th day of September, 2006, the undersigned filed the
following document(s) in the above-captioned cause, a copy of which is attached hereto.

        SENTENCING MEMORANDUM

                                        s/Luis M. Galvan
                                        LUIS M. GALVAN
                                        FEDERAL DEFENDER PROGRAM
                                        55 East Monroe Street, Suite 2800
                                        Chicago, IL 60603
                                        312\621-8352

Dated: September 26, 2006

F I C L E 1 D  Case 1:05-cv-00546    Document 66    Filed 04/13/2006    Page 1 of 19

APR 1 3 2006

JUDGE JAMES B. ZAGEL
UNITED STATES DISTRICT COURT

**F I L E D**

APR 1 3 2006

JUDGE JAMES B. ZAGEL
UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA          )
                                  )
         v.                       )     No. 05 CR 546
                                  )     Judge James B. Zagel
WILLIAM MOOREHEAD                 )
                                  )

## PLEA AGREEMENT

This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and the defendant, WILLIAM MOOREHEAD, and his attorney, LUIS GALVAN is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure.

This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in the above captioned case.

This Plea Agreement concerns criminal liability only, and nothing herein shall limit or in any way waive or release any administrative or judicial civil claim, demand or cause of action, whatsoever, of the United States or its agencies. Moreover, this Agreement is limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities or agencies except as expressly set forth in this Agreement.

By this Plea Agreement, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, and the defendant, WILLIAM MOOREHEAD, and his attorney, LUIS GALVAN, have agreed upon the following:

1. Defendant acknowledges that he has been charged in Counts One and Two of the indictment in this case with the following violations: Devising and participating in a scheme to defraud and to obtain money and property by means of material false and fraudulent pretenses and misrepresentations in violation of 18 U.S.C. §§ 1343 and 2.

2. Defendant has read the charges against him contained in the indictment in this case and the charges have been fully explained to him by his attorney.

3. Defendant fully understands the nature and elements of the crimes with which he has been charged.

4. Defendant will enter a voluntary plea of guilty to Counts One and Two of the indictment in this case.

5. Defendant will plead guilty because he is in fact guilty of the charges contained in Counts One and Two of the indictment in this case. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt. The following is not a complete statement of all the details known to the defendant regarding the defendant's criminal

2

conduct.  The following facts are set forth solely as a factual

basis for this guilty plea:

Defendant WILLIAM MOOREHEAD ("Moorehead"), admits that, together with Brian Townsend ("Townsend") and Patricia Taylor ("Taylor"), and at least one other individual (Individual A), from no later than early 1994, and continuing until at least August 2002, defendant Moorehead knowingly and intentionally devised and intended to devise and participated in a scheme and artifice to defraud and to obtain money and property from the Department of Housing and Urban Development ("HUD"), the Chicago Housing Authority ("CHA"), and other property owners by means of materially false and fraudulent pretenses, representations and promises, and by means of material omissions.

Moorehead was the president of a property management company known as William Moorehead & Associates ("Moorehead & Associates"). Defendant Townsend was the Controller of that company from approximately 1991 through September 1999. Defendant Taylor was the Controller for that company from approximately September 1999 through July 2001.  Individual A was the Controller from approximately July 2001 through April 2002.

Moorehead & Associates managed more than 13 multi-unit apartment buildings, many of which were operated by the CHA and/or were insured, financed, or subsidized by HUD.  The buildings included buildings for senior citizens and individuals with low incomes.

Defendant Moorehead, and others acting at his direction, including  Townsend, Taylor, and Individual A, fraudulently converted, misapplied, misappropriated, embezzled, transferred, and took (hereinafter referred to as took) at least $995,000 from projects that defendant Moorehead's company was managing, and the Marion Stamps Charity Fund ("Charity Fund").

Defendant Moorehead and others acting at his direction fraudulently took those funds by: (a) transferring funds from one project to another without authorization; (b) writing checks made payable to cash, and to defendant Moorehead or his company, without authorization; and (c) by transferring funds from project accounts into accounts belonging to defendant Moorehead or his company, without authorization.

Defendant Moorehead and others acting at his direction, including  Townsend, Taylor, and Individual A, made false representations to auditors and others, inflated certain bank

3

accounts by depositing worthless checks, filed inaccurate monthly reports, and created false records, including false bank statements, false ledgers, false bank reconciliations, and false invoices.

### False Representations

In order to obtain access to funds, retain funds, and perpetuate the scheme, defendant Moorehead, and others acting at his direction, including Townsen, Taylor, and Individual A, made false representations and promises, which included falsely representing that defendant Moorehead and his company: (a) would preserve and protect the funds that defendant Moorehead subsequently took, by depositing and holding those funds in certain bank accounts; (b) would and did distribute and use those funds for only legitimate, authorized purposes; (c) would and did prepare and maintain true and accurate financial records; and (d) would and did submit to HUD, the CHA, and other property owners, true and accurate audited financial statements, and monthly reports, for certain projects, reflecting all financial transactions.

By signing HUD Certifications and CHA agreements, defendant Moorehead and his company falsely represented that they would use project funds for the benefit of the housing projects and the tenants, when in fact the defendant intended to and did fraudulently take monies from those projects for his own benefit and the benefit of other projects. Defendant Moorehead and his company also falsely represented that they would maintain and provide true and accurate financial records and information, when in fact the defendant intended to and did provide materially false information to the project auditors, project owners, CHA, and HUD, and created and maintained records containing materially false information and material omissions.

### Funds Fraudulently Taken From Projects

Defendant Moorehead, and others acting at his direction, took money from many of the projects that defendant Moorehead's company managed, including Evergreen Tower, Evergreen Terrace, Evergreen Sedgwick, Grove Parc Plaza, Island Terrace, Kenneth Campbell, Lake Michigan Apartments, Lawndale Gardens, Midway Gardens, Rockwell Gardens, Robert Taylor Homes, Scattered Sites SW, Scattered Sites West, and 65th Street Apartments.

Defendant Moorehead, and others acting at his direction, including Townsend, fraudulently took funds by issuing checks made payable to cash, or to defendant Moorehead or his company, which defendant Moorehead cashed or deposited for his own benefit and use. Defendant Moorehead and others acting at his direction, including defendant Townsend, issued checks to other projects that

were being managed by defendant Moorehead's company. Defendant Moorehead also used project funds to pay personal and business expenses, to purchase a Certificate of Deposit, and to purchase a car for his own use.

Between approximately October 1997 and June 2002, defendant Moorehead took more than $300,000 from the Charity Fund by issuing checks to cash, to defendant Moorehead, to his company, and to certain projects, including Evergreen Terrace and Evergreen Sedgwick. Because the Charity Fund required two signatures on every check, defendant Moorehead forged the signature of his co-signer on certain checks that he used to fraudulently take funds from the charity. In order to conceal his taking those funds, defendant Moorehead made deposits into the account, so that he could make expected distributions from the account. Moorehead failed to repay approximately $19,991.

### False and Fraudulent Records

Defendant Moorehead, and others acting at his direction including Townsend, Taylor, and Individual A created false and fraudulent records in order to carry out this scheme, lull victims, and cover up the fraudulent taking of funds so that Moorehead could continue fraudulently taking funds from the properties that his company managed and from the Charity Fund, which included the following:

a. Between approximately 1997 and 2001, defendant Moorehead and others acting at his direction, including Individual A, took more than $350,000 from Evergreen Tower, and then created false invoices and checks, and other false documents, which were provided to auditors to show that the project funds were used to pay expenses for Evergreen Tower, even though no such payments were actually made.

b. Defendant Moorehead, together with Townsend, Taylor, and Individual A, created false bank statements, bank reconciliations, and check ledgers that did not include certain checks that were used to take funds. Defendant Moorehead used bank counter checks without numbers, instead of using printed checks, so that all of the numbered checks could be provided to project auditors, without disclosing the checks used to fraudulently take funds.

c. Defendant Moorehead, together with Townsend and Taylor, created false records relating to the TUF Credit Union, including bank confirmations and financial records, showing that various projects had funds on deposit at TUF, when, in fact, the defendants each knew that there were no funds on deposit at TUF,

5

and that TUF was not in business during the relevant time period. Defendant Moorehead forged signatures on bank confirmations from TUF, falsely confirming for project auditors that project funds were on deposit at TUF.

d. Defendant Moorehead, together with Townsend and Taylor, created falsely inflated bank account statements at the end of the year by depositing worthless checks into accounts which were short on funds as a result of defendant Moorehead's fraudulently taking funds. The falsely inflated bank account statements were provided to auditors. In approximately December 1998, defendant Moorehead wrote seven NSF checks totaling approximately $239,000, on an account that had only $.05 in it, and caused those checks to be deposited into accounts for Grove Parc, Evergreen Terrace, Scattered Sites West, Kenneth Campbell Apartments, and Lawndale Gardens, in order to falsely inflate the balance of those accounts in connection with the year end audit.

e. Defendant Moorehead, together with Townsend and Taylor, maintained two sets of financial records for Grove Parc and other projects, one set containing accurate financial information, and one set containing inflated numbers that concealed Moorehead's misuse of funds.

f. Defendant Moorehead, together with Townsend, Taylor, and Individual A submitted and caused others to submit to HUD, the CHA, and property owners, certain monthly reports and audited financial statements that contained materially false and fraudulent information, and material omissions. Audited financial statements containing false information were submitted to HUD by means of interstate wire.

### Repayment of Project Funds Using Other Project Funds

In order conceal the misuse of funds and continue the scheme, and to avoid losing the management contracts at other projects, defendant Moorehead and others acting at his direction, including defendant Townsend, fraudulent took money from certain projects to repay other projects for funds that had previously been taken, including the following:

a. Between approximately 1994 and 1997, defendant Moorehead took approximately $250,000 from Midway Gardens. When the management contract for Midway Gardens was cancelled in 1997, defendant Moorehead repaid Midway Gardens by fraudulently taking funds from Grove Parc Plaza and Rockwell Gardens.

b. Between approximately 1996 and 2001, defendant Moorehead and others acting at his direction, including defendant

6

Townsend took more than $500,000 from Grove Parc Plaza. When project auditors discovered that funds were missing in 2001, defendant Moorehead, and others acting at his direction, repaid Grove Parc Plaza by fraudulently taking funds from other projects, including funds from Robert Taylor Homes. Defendant Moorehead concealed the source of the funds by writing checks to cash and to his company, and by transferring funds into his company's account, and then obtaining cashiers checks which he used to repay Grove Parc.

### Concealment

Defendant Moorehead, together with Townsend, Taylor, and Individual A, did misrepresent, conceal, hide and cause to be misrepresented, concealed and hidden the purposes of and acts done in furtherance of this fraud scheme. In order to conceal the scheme, defendant Moorehead, together with Townsend, Taylor, and Individual A, made false entries in financial records, created and used false documents, including false bank statements, check registers, invoices, and bank confirmations, and made false representations to auditors, property owners, the CHA, HUD, and others.

### Use of the Mails and Wires

Defendant Moorehead, together with Townsend, Taylor, and Individual A, executed and attempted to execute this scheme by causing various documents, including bank confirmations containing false information, to be sent through the mail, funds to be transferred by interstate wire, and audited financial statements containing false information to be transmitted by interstate wire.

### Count One: Wire Fraud - Grove Parc's Audited Financial Statement

Defendant Moorehead, together with Townsend and Taylor, maintained false financial records relating to Grove Parc for calendar year 1999. Defendant Moorehead believed that those false financial records would be relied upon during the year-end audit for 1999, and that an audited financial statement containing false financial information would be sent to HUD by wire. In approximately March 1999 and June 1999, defendant Moorehead and Townsend provided false bank records relating to Grove Parc Plaza to project auditors, which resulted in false information being included in the audited financial statement for Grove Parc Plaza for calendar year 1999, which was electronically transmitted to HUD.

On or about November 16, 2000, at Chicago, Illinois, defendant Moorehead, together with Townsend and Taylor, for the purpose of executing the above-described scheme, and attempting to do so, did knowingly cause to be transmitted in interstate commerce from

Chicago, Illinois, to Washington, D.C., by means of wire and radio communications, certain signs, signals and sounds, namely: the electronic transmission of an audited financial statement for Grove Parc Plaza Apartments for calendar year 1999, which contained false information relating to Grove Parc Plaza's finances, which was transmitted to HUD, in violation of Title 18, United States Code, Section 1343 and 2.

**Count Two: Wire Fraud-Evergreen Tower's Audited Financial Statement**

Defendant Moorehead maintained false financial records relating to Evergreen Tower for calendar year 2000. Defendant Moorehead believed that those false financial records would be relied upon during the year-end audit for 2000, and that an audited financial statement containing false financial information would be sent to HUD by wire. Defendant Moorehead submitted and caused others to submit to HUD audited financial statements for Evergreen Tower that contained materially false and fraudulent information, and material omissions. Defendant Moorehead provided false financial information and fraudulent records relating to Evergreen Tower to project auditors, which resulted in false information being included in the audited financial statement for Evergreen Tower for calendar year 2000, which was electronically transmitted to HUD.

On or about September 17, 2002, defendant Moorehead, for the purpose of executing the above described scheme, and attempting to do so, did knowingly cause to be transmitted in interstate commerce from Chicago, Illinois, to Washington, D.C., by means of wire and radio communications, certain signs, signals and sounds, namely: the electronic transmission of an audited financial statement for Evergreen Tower for calendar year 2000, which contained false information relating to Evergreen Tower's finances, which was transmitted to the Department of Housing and Urban Development; in violation of Title 18, United States Code, Section 1343 and 2.

6.   For purposes of calculating the Guidelines promulgated by the United States Sentencing Commission pursuant to Title 28, United States Code, Section 994, the parties stipulate and agree on the following points:

a.   The applicable Guidelines version is the 2001 Guidelines Manual.

b.   The applicable Guidelines Section is § 2B1.1, and the base offense level is 6.

c.   The parties agree that pursuant to Guideline § 2B1.1(b)(1)(H), the base offense level should be increased by 14 levels because the loss that defendant Moorehead knew about or could reasonably foresee was between $400,000 and $1,000,000.  The parties agree that the loss does not overstate the seriousness of the offense, and the defendant agrees and stipulates that he will not seek a downward departure based on the loss calculation.

d.   The parties agree that pursuant to Guideline § 2B1.1(b)(8)(C), the base offense level should be increased by 2 levels, because the offense involved sophisticated means.

e.   The parties agree that the base offense level should be increased by 2 levels, pursuant to Guideline § 3B1.1(c), based on the defendant's role in the offense because the defendant was an organizer/leader of a criminal activity.

f.   The parties agree that the base offense level should be increased by 2 levels, pursuant to Guideline § 3B1.3 because the

defendant abused a position of trust in a manner that significantly facilitated the commission and concealment of the offense.

g.    The parties agree that the defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for her criminal conduct.    If the government does not receive additional evidence in conflict with this provision, and if the defendant continues to accept responsibility for her actions, within the meaning of Guideline § 3E1.1, a 2 level reduction in the offense level is appropriate.

h.    The parties agree that the defendant has provided timely notice of her intention to enter a plea of guilty, within the meaning of Guideline § 3E1.1(b), so that an additional 1 point reduction in the offense level is appropriate, if the offense level is 16 or greater, and the Court finds that a reduction under Guideline § 3E1.1(a) is appropriate.

i.    Based on the facts known to the government, the defendant's criminal history points equal 0 and the defendant's criminal history category is I.

j. Based on the above calculations, which are preliminary in nature, and assuming that the defendant's criminal history category is I, the preliminary projected applicable offense level is a level 23, so that the preliminary projected applicable sentencing range is 46 to 57 months.

k.   The defendant and his attorney and the government acknowledge that the above calculations are preliminary in nature and based on facts known to the government as of the time of this Agreement.  The defendant understands that the Probation Department will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Sentencing Guidelines calculation.  Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations.

7.   Errors in calculations or interpretation of any of the guidelines may be corrected by either party prior to sentencing.  The parties may correct these errors or misinterpretations either by stipulation or by a statement to the probation office and/or court setting forth the disagreement as to the correct guidelines and their application.  The validity of this Agreement will not be affected by such corrections, and the defendant shall not have a right to withdraw his plea on the basis of such corrections.

8.  Defendant understands that, in imposing the sentence, the Court will be guided by the United States Sentencing Guidelines.  The defendant understands that the Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

9.   Defendant understands that:

11

(a) Counts One and Two of the indictment to which he will plead guilty each carry a maximum penalty of 5 years' imprisonment, a maximum fine of $250,000, or a fine not more than twice the gross gain to the defendant or twice the gross loss to the victims, whichever is greater, and a term of supervised release of at least two years but not more than three years, as well as any restitution ordered by the Court; and

(b) The total potential sentence to which defendant is pleading guilty is a maximum penalty of 10 years' imprisonment, a maximum fine of $500,000, or a fine not more than twice the gross gain to the defendant or twice the gross loss to the victims, whichever is greater, and a term of supervised release of at least two years but not more than three years, as well as any restitution ordered by the Court.

10.  The defendant understands that in accordance with federal law, Title 18, United States Code, Section 3013, upon entry of judgment of conviction, the defendant will be assessed $100 on Counts One and Two of the Indictment to which he has pled guilty, in addition to any other penalty imposed.  The defendant agrees to pay the special assessment of $100 at the time of sentencing with a check or money order made payable to the Clerk of the U. S. District Court.

11. Defendant understands that by pleading guilty he surrenders certain rights, including the following:

12

(a) If defendant persisted in a plea of not guilty to the charges against him, he would have the right to a public and speedy trial. The trial could be either a jury trial or a trial by the judge sitting without a jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

(b) If the trial is a jury trial, the jury would be composed of twelve laypersons selected at random. Defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising so-called peremptory challenges. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that defendant is presumed innocent, and that it could not convict him unless, after hearing all the evidence, and considering each count separately, it was persuaded of defendant's guilt beyond a reasonable doubt.

(c) If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt.

(d)   At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant.  Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.  In turn, defendant could present witnesses and other evidence in his own behalf.  If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court.

(e)  At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify.  If defendant desired to do so, he could testify in his own behalf.

12.  Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraph. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.  Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial.

13. The defendant is also aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal the sentence imposed.  Acknowledging this, the defendant knowingly waives the right to appeal any sentence within the maximum provided in the statutes of conviction, in exchange for the concessions made by the United States in this Plea Agreement.  The defendant also

14

waives his right to challenge his sentence or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation.

14. Defendant understands that the indictment and this Plea Agreement are matters of public record and may be disclosed to anyone.

15. The United States Attorney's Office for the Northern District of Illinois agrees not to seek additional criminal charges in the Northern District of Illinois against the defendant for the events between approximately 1994 and August 2002, which occurred in the Northern District of Illinois, relating to the fraudulent taking of funds from the CHA, HUD, and other property owners, described above in this plea agreement, and which the defendant has described in proffers provided to the United States. However, nothing in this Agreement limits the United States in the prosecution of the defendant in other districts or for crimes not disclosed in this plea agreement and in his proffers.

16. Defendant understands that the United States Attorney's Office will fully apprise the District Court and the United States Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against him in this case, and related

matters, including all matters in aggravation and mitigation relevant to the issue of sentencing.

17.    At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. Both parties are free to recommend whatever sentence they deem appropriate within the applicable guidelines, except that the defendant reserves the right to seek a downward departure based on extraordinary family circumstances; the government is free to oppose that motion, and is free to take any position on the propriety or extent of the proposed departure.

18.    It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose the maximum penalties as set forth in paragraph 9 above. However, the sentencing court is obligated to consult and take into account the Sentencing Guidelines in imposing a reasonable sentence. The defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, the defendant will have no right to withdraw his guilty plea.

19.    Regarding restitution, the parties agree as follows:

a.    The defendant acknowledges that pursuant to Title 18, United States Code, Section 3663A the Court must order defendant to make restitution in the full amount due and owing as it relates to the Marion Stamps Memorial Charity Fund. The defendant acknowledges

16

that the appropriate amount of restitution may be at least $19,991,
payable to the Marion Stamps Memorial Charity Fund.

b.  As to the properties managed by the defendant and his
company, this is a case in which, as set forth in Title 18, United
States Code, Section 3663A(c)(3)(B), calculating restitution, if
any, would raise complex issues of fact that would unduly
complicate and prolong the sentencing process to a degree that the
need to provide restitution to any victim is outweighed by the
burden on the sentencing process.  The calculation of restitution,
if any, would involve the very time-consuming review of a large
number of transactions, invoices, and bank records from more than
50 bank accounts.

20.  The defendant understands that Title 18, United States
Code, Section 3664 and Sections 5E1.1 and 5E1.2 of the Sentencing
Guidelines set forth the factors to be weighed in setting a fine
and in determining the schedule, if any, according to which
restitution is to be paid in this case.  The defendant agrees to
provide full and truthful information to the court and United
States Probation Officer regarding all details of his economic
circumstances in order to determine the proper restitution schedule
according to which the defendant may be ordered to pay, and to
provide such information to the United States Attorney's office.
Defendant understands that providing false or incomplete
information may be prosecuted as a violation of Title 18, United

17

States Code, Section 1001, or as a contempt of the court, and would constitute a breach of this Plea Agreement.

21.   Defendant understands that his compliance with each part of this Plea Agreement extends throughout and beyond the period of his sentence, and failure to abide by any term of the Plea Agreement is a violation of the Agreement. He further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute the defendant not subject to any of the limits set forth in this Agreement, or to resentence the defendant.   The defendant understands and agrees that in the event that the defendant's Plea is subsequently withdrawn, vacated or breached by the defendant, and the Government elects to void the Plea Agreement and prosecute the defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

22.   Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

18

23.   Defendant agrees this Plea Agreement shall be filed and become a part of the record in this case.

24.   Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney.   Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE:   4.13.06


PATRICK J. FITZGERALD
UNITED STATES ATTORNEY


WILLIAM MOOREHEAD
Defendant


JACQUELINE STERN
Assistant United States Attorney


LUIS GALVAN
Attorney for Defendant


19