# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.  05 CR 546-1 |
| v. | ) | Judge James B. Zagel |
| | ) | |
| WILLIAM MOOREHEAD | ) | |

## SENTENCING MEMORANDUM

Defendant WILLIAM MOOREHEAD, by the FEDERAL DEFENDER PROGRAM and its attorney, LUIS M. GALVAN, respectfully requests, pursuant to United States v. Booker, 125 S.Ct. 738 (2005), and 18 U.S.C. § 3553(a), that this Honorable Court sentence him to a term of probation or home detention with additional conditions. In support of this motion, Mr. Moorehead states as follows:

### I.       Background and Sentencing Recommendation

On April 13, 2006, in a plea agreement between the United States Attorney's Office and William Moorehead, Mr. Moorehead entered a plea of guilty to two counts of devising and participating in a scheme to defraud and to obtain money and property by means of material false and fraudulent pretenses and misrepresentations in violation of 18 U.S.C. §§ 1343 and 2. In addition, Mr. Moorehead acknowledges that pursuant to 18 U.S.C. § 3663(a), the Court must order him to make restitution in the amount of $19, 991, which is due and owing as it relates to the Marion Stamps Memorial Charity Fund. Further, Mr. Moorehead understands that calculating restitution, if any, as set forth in 18 U.S.C. § 3663A (c)(3)(B) as it relates to the properties

managed by himself and his company would raise complex issues of fact that would unduly complicate and prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process. The calculation, if any, would involve the very time-consuming review of a large number of transactions, invoices, and bank records.

Under guideline § 2B1.1 the base offense level is 6. After adjustments, Mr. Moorehead's base offense level is 23. His criminal history category is I. Based on an offense level of 23 and a criminal history category of I, the advisory guideline range for imprisonment is 46 to 57 months.

Mr. Moorehead now stands before this Court for sentencing and respectfully submits this memorandum in order to provide information to assist this Court in fashioning a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C. § 3553(a) in light of United States v. Booker, 125 S.Ct. 738 (2005).

## II.    Legal Basis

Booker established that United States Sentencing Guidelines are merely "advisory," and that sentencing courts are required to consider all of the factors listed in 18 U.S.C. § 3553(a) in imposing sentence. Booker, 125 S.Ct. 738, 757 (2005). In effect, Booker clarified that the sentencing guidelines are simply one of several factors a court must consider in sentencing a defendant. Id. at 764.

With respect to 18 U.S.C. § 3553(a), Booker established a new, independent limit on the sentence that may be imposed on a defendant. The primary sentencing mandate of § 3553(a)

states that courts must impose a sentence that is "sufficient but not greater than necessary, to comply with" the purposes of sentencing which are justice, deterrence, the need to protect society, and rehabilitation of the defendant. Id. at 765. To do so, a court in imposing sentence, shall consider:

> the nature and circumstances of the offense, § 3553(a)(1);
>
> the history and characteristics of the defendant, § 3553(a)(1);
>
> • the kinds of sentences available, § 3553(a)(3)
>
> • pertinent Sentencing Commission policy statements, § 3553(a)(5)
>
> • the need to avoid unwarranted sentencing disparities, § 3553(a)(6)
>
> the need to provide restitution to any victims of the offense, § 3553(a)(7).

Significantly, Booker emphasizes that under the Sentencing Reform Act "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Booker, 125 S.Ct at 760 (quoting 18 U.S.C. § 3361).

The Seventh Circuit has held that Booker requires district courts to consider the factors set forth in 18 U.S.C. § 3553(a) when sentencing defendants under the advisory guidelines. United States v. Dean, 414 F.3d 725, 729 (7th Cir. 2005) ("Section 3553(a), unlike the guidelines themselves after Booker, is mandatory.")(citing Booker, 125 S.Ct. at 764-65); United States v.

Cunningham, 429 F.3d 673, 676 (7th Cir. 2005)(explaining that § 3553(a) is "a directive to the sentencing court"). Thus, if the defendant raises § 3553(a) factors in requesting a below-guideline sentence, the court is required to conduct an analysis of how those § 3553(a) factors apply to the facts, and to explain why a particular sentence is appropriate under § 3553(a). Id. at 675-76. The Seventh Circuit will therefore scrutinize a district court's refusal to grant a reduction below the advisory guideline range. United States v. Vaughn, 433 F.3d 917, 924 (7th Cir. 2006). Moreover, "there is no presumption of unreasonableness that attaches to a sentence that varies from the range." United States v. Jordan, 435 F.3d 693, 698 (7th Cir. 2006)(emphasis in original). In fact, the Seventh Circuit has held that the sentencing judge "cannot treat all sentences that would fall within the guidelines sentencing range as reasonable per se." Cunningham, 429 F.3d at 676.

Accordingly, this Court has the discretion to sentence Mr. Moorehead anywhere within the statutory range so long as the sentence is not "unreasonable" in light of the § 3553(a) factors. See generally Booker, 2005 LEXIS 628, at *71-76; see also United States v. Hughes, 2005 U.S. App. LEXIS, at *10 (4th Cir. Jan. 24, 2005)(holding that after Booker, "the discretion of a sentencing court is no longer bound by the range prescribed by the guidelines.") Alternatively, this Court may sentence Mr. Moorehead outside of the Guideline range without establishing that he meets any traditional departure grounds. See, e.g., United States v. Jones, 2005 U.S. Dist. LEXIS 833, at *9 (D. Me. Jan. 21, 2005)("review[ing] the sentencing factors in 18 U.S.C. § 3553(a) in determining whether to apply the now advisory Guidelines, and ultimately sentencing the defendant below the Guideline range for reasons that would not warrant a departure.")

## III.   Section 3553(a) Sentencing Factors as Applied to William Moorehead

4

A.    The Nature and Circumstances of the Offense

In a plea agreement with the United States Attorney's Office, Mr. Moorehead entered a plea of guilty to defraud the Department of Housing and Urban Development ("HUD"), the Chicago Housing Authority ("CHA"), and other property owners. Mr. Moorehead admitted that he made a huge mistake and is deeply remorseful for his conduct. As Mr. Moorehead states in his letter to the Court, "I did co-mingle funds by using funds from one project to another and covering it up without approval...I know what I did was wrong but it was not to intentionally hurt anyone, it was very bad business practice and a way to keep cash flow for the projects." However, while Mr. Moorehead fully acknowledges the illegality of his conduct, the unusual facts of this case remain an important consideration in assessing the nature of the offense, his culpability, and determining his sentence.

Interestingly, this case presents a unique regulatory backdrop with respect to Mr. Moorehead's property management services to housing projects. Generally, the housing projects were funded by the HUD and CHA. Moorehead and Associates were required to keep record of all activity related to the projects and then submit the records to HUD and CHA for funding. In turn, HUD and CHA dispersed funds to Moorehead and Associates to be used for each project separately.  However, as stated by Mr. Moorehead, there were times when Moorehead and Associates would not receive funds from either agency on time to pay the expenses required to operate the projects. In fact, it sometimes took over 90 days to receive the monies. In the mean time, Mr. Moorehead had to meet payroll and pay the operating expenses of the buildings so that the tenants would have heat and running water.

5

In order to pay these expenses, Mr. Moorehead transferred funds from one development to another, used his personal money, or borrowed funds from his company. When the funds came in for a particular project, the money borrowed from a development would be immediately paid back. On one occasion, Mr. Moorehead used his personal money - over $190,000 - to pay contractors for work performed at one development. Also, Mr. Moorehead had to advance monies to projects from his company to meet payroll, so employees of the buildings would get paid on time. Moorehead and Associates was subsequently reimbursed when the funds became available.

Considering the unique circumstances presented here, respectfully, the offense conduct overstates the seriousness of Mr. Moorehead's offense. As stated earlier, Mr. Moorehead did not set out to purposely hurt or defraud anyone. Rather, as explained by Mr. Moorehead, it was a "very bad business practice and a way to keep cash flow for the projects."

Notably, Mr. Moorehead cooperated extensively with the government. For this, he received a 2 point downward adjustment to his offense level for acceptance of responsibility and a 1 point adjustment for timely notification. Should this cooperation prove fruitful for future prosecutions there will be further downward adjustments for Mr. Moorehead. Regarding restitution, Mr. Moorehead is still a partner in a business interest that owns real estate in an area that is valuable property. The property value is expected to prosper as it becomes more sought after by future investors. Therefore, in this case, the possibility of full restitution is a virtual certainty. Other factors worth considering are that Mr. Moorehead's offense did not involve drugs or violence and he does not pose a threat to the public.

B.    History and Characteristics of William Moorehead

In May 1962, Mr. Moorehead graduated from Broadstreet High School in Greenwood

Missippi. He attended Jackson State University in Jackson, Mississippi and Loop College (now

Harold Washington College) in Chicago, Illinois during the mid-1960s. He did not earn a degree

from these colleges, but he did earn a bachelor of science degree with a major in urban studies in

1976 from De Paul University in Chicago, Illinois. Mr. Moorehead has a valid real estate

broker's license and a certificate in property management. He specializes in training in real estate

and property management.

Mr. Moorehead has over 150 cumulative years of dedicated volunteer work and service to

the community. He is instrumental in providing low income housing for hundreds of families as

well as implementing health care access, job training and employment for the underprivileged.

As a result of his dedication to the community, Mr. Moorehead has received the Human

Relations Award from the city of Chicago, the National Association of Community Health

Centers Award, and the Illinois Primary Health Care Association honored him with the

Consumer Board Dedication Award. Also, the community celebrated Mr. Moorehead's

contribution to society by renaming a section of Cleveland Avenue in Chicago to "William

Moorehead Street."

Mr. Moorehead's contributions to the community can hardly be ignored. For instance, as

a charter member and president of the Near North Development Coporation, he advanced the

development of housing for low to moderate income families and senior citizens on the near

north side of Chicago. As a LEED council member, he worked to keep jobs in Chicago and

provided job training for residents of Cabrini Green and Near North side housing developments.

In 1982, with the help of Northwestern Hospital, Children's Memorial Hospital and the community, Mr. Moorehead assisted in establishing the Near North Health Services Corporation. As chairman of this program he was able to provide health care to the poor and under served. His company, William Moorehead and Associates, worked with the Earn-Fare Program to provide jobs and job training to welfare recipients. He also developed the Resident Initiative Program for Public Housing, which provided social services, life skills, and computer training to residents in various housing developments.

Impressively, Mr. Moorehead's passion is not only reflected in the community, but it is shown throughout his life. He is 63 years old. He has never used drugs and he does not have a history of substance abuse. He was married to Verdie Moorehead from 1964 until 1994. Their marriage produced four children: William Moorehead, Jr. is 41 years old, Timothy and Donald Moorehead are 35 years old, and Maurice Moorehead is 33 years old. Mr. Moorehead has seven grandchildren who all live in Chicago, Illinois. Mr. Moorehead's oldest son, William Moorehead Jr. has four children who live with Verdie. Their ages range from 13 - 18 years of age. The children live with Verdie, because William Moorehead Jr. has a drug problem that has kept him incarcerated in the Cook County Department of Correction.

Mr. Moorehead married his second wife, Mia Moorehead in December 1996 in Oak Park Illinois. Their union produced no children, but Mr. Moorehead adopted Mia's son from a previous marriage. His son's name is Jimmie Moorehead and he is 18 years old. As a result of this case, Mia Moorehead filed for divorce from Mr. Moorehead. They are sharing custody of their son, but Jimmie lives with Mr. Moorehead and attends college.

It is important to understand Mr. Moorehead's value in his family's life. His son,

8

Maurice, suffers from brain damage and asthma that is a result from complications at birth. The doctors did not properly monitor Verdie's progress during labor. As a result, Maurice was deprived of oxygen for too long, which caused brain damage. Maurice is 33 years old, but his mind functions at the level of a 3 year old child. While he is emotionally responsive, he cannot speak, cook or be left alone. He cannot support himself independently. Maurice lives with his mother, Verdie, Mondays through Fridays. He lives with Mr. Moorehead Fridays through Sundays. Verdie and Mr. Moorehead share the responsibility of transporting Maurice to school at a center run by the Chicago Association for Retarded Citizens.

In addition to his severe developmental disability, Maurice has a history of suffering from various ailments. He has Keloids, which is a skin disease. He has surgery to have these removed every 2 - 3 years. In addition, he has suffered from multiple hernias. Approximately ten years ago, Maurice had his first surgery for a hernia. On September 20, 2006, he went through surgery for a double hernia. Mr. Moorehead brings Maurice to the hospital for every surgery and is waiting at the bedside for his son to wake up each time.

Mr. Moorehead has been essential to Maurice's development. He has taught Maurice the practical functions of living day to day, such as bathing and dressing. Mr. Moorehead brings Maurice to his grandchildren's football games, they go for walks, attend movies, go out for dinner and participate every Sunday at church. Mr. Moorehead has been vital to addressing Maurice's healthcare needs. Before this case forced Mr. Moorehead to leave his job, he spent $4,000 per month for Maurice's medical expenses that his insurance would not cover. However, without a job, Mr. Moorehead has no earning capacity. Therefore, approximately four months ago, Mr. Moorehead was forced to place Maurice on Medicaid. Mr. Moorehead still pays

relatively $300 per month that Medicaid cannot cover.

The grandchildren who live with Verdie love Maurice, but they cannot provide the necessities that Mr. Moorehead gives to him. They are too young to be able to financially provide for Maurice, they do not drive a car, and they will be attending college in the future. Mr. Moorehead's other children cannot provide for Maurice, because of their own children and families they need to support.

Mr. Moorehead's responsibility as care giver for Maurice warrants a sentence of probation or home detention. In fact, sentencing Mr. Moorehead within the guideline range would have a devastating impact on the Moorehead family and the community.

First, should Mr. Moorehead be incarcerated, the immediate impact would be that both Maurice and Jimmie would lose the indispensable parental support, nurture, and love that Mr. Moorehead has provided throughout their lives. It is a testimony to Mr. Moorehead's child rearing ability that his son, Maurice, has made positive physical and emotional progress since his birth. Clearly, Mr. Moorehead's exceptional care-giving capacities plays an important part in his family's lives. To deprive the family of their father so suddenly and without their ability to comprehend this result, would certainly have a devastating impact on them.

Secondly, the family would also lose Mr. Moorehead's income. Verdie Moorehead does not work. She is still raising her four grandchildren. At her age, it is difficult to find a job that can provide the support that is necessary for five children, especially for a child with a developmental disability. It is not feasible to hire a care giver to provide for Maurice's special needs, because there is no income. Maurice may digress physically and emotionally if not provided consistent care or individualized attention.

10

Also, the community would benefit from Mr. Moorehead receiving a sentence of probation or home detention. He has consistently proven to be an instrument for the underprivileged receiving housing, job training and healthcare. Further, his son is forced to be put on Medicaid, which adds to the billions of dollars already spent by Illinois on the program. The proposed cuts to Medicaid could have a devastating impact on Maurice and his family. By providing for Maurice, Mr. Moorehead could supplement Maurice and prevent a burden to the Medicaid program.

Mr. Moorehead and Verdie are getting older. Mr. Moorehead needs to spend as much of his time the court will grant him towards earning and saving money, so Maurice can use it towards his medical and daily living expenses. Allowing Mr. Moorehead provide for his family will benefit them and the community.

Considering the greater harm that the Moorehead family would suffer, given that a sentence of probation or home detention is available, incarcerating Mr. Moorehead is not necessary to achieve the goals of punishment.

C.    The Kinds of Sentences Available

Because the guidelines are now advisory, this Court can sentence Mr. Moorehead to any reasonable sentence. Mr. Moorehead's applicable sentence lies in Zone D of the Sentencing Table. Under the guidelines, with an offense level of 23 and a criminal history category of I, Mr. Moorehead may be sentenced from 46 to 57 months and would not be eligible for probation. However, because the Sentencing Guidelines are no longer binding, courts have discretion to impose probation, home confinement, or a split sentence even when the defendant falls with Zone D of the Sentencing Table. Many courts have done precisely this. See, e.g., United States v.

11

Jones, 352 F. Supp. 2d 22, 25 (D. Maine 2005 ) (varying from guidelines to impose sentence of

home detention despite the fact that departure under sentencing guidelines not warranted.);

United States v. Kelly, 355 F. Supp. 2d 1031 (D. Neb. 2005)(sentence of home detention);

United States v. Neimoeller, No. 02-09-CR-1, 2005 WL 1799456 (S.D. Ind. July 15,

2005)(same); United States v. Anderson, 365 F. Supp. 2d 67 (D. Maine2005)(split sentence).

Accordingly in this case, probation, home detention, work release or a split sentence involving

home detention with work dedicated to a volunteer low-income housing organization is available

to this Court. Under § 3553(a), this Court must consider these options in determining a sentence

that is "sufficient but not greater than necessary" to achieve the goals of punishment.

D.    The Sentencing Guideline Range

        In a written plea agreement with the United States Attorney's Office, Mr. Moorehead

entered a plea of guilty to two counts of devising and participating in a scheme to defraud and to

obtain money and property by means of material false and fraudulent pretenses and

misrepresentations. In addition, Mr. Moorehead acknowledges that the Court must order him to

make restitution in the amount of $19, 991, which is due and owing as it relates to the Marion

Stamps Memorial Charity Fund. The written plea agreement outlines the application of the

sentencing guidelines based on a scheme to defraud and obtain money and property by means of

material false and fraudulent pretenses. Under §2B1.1, the base offense level for this loss is 6.

However, after adjustments including acceptance of responsibility and cooperation, Mr.

Moorehead's base offense level is 23. Together with a criminal history category of I, the advisory

guideline range for imprisonment is 46 to 57 months.

E.    Public Policy

While the Court cannot ignore the culpability of Mr. Moorehead, it cannot discount

society's interest in stable families. Accordingly, it is much better that Mr. Moorehead be

sentenced to probation, work release or home detention, so that he can continue to support his

family financially as well as provide nurture and care to his children.

Markedly, the Chicago Health and Disability Advocates point out that family support and

cohesion are instrumental in a sustainable community. Chicago Health and Disability Advocates,

Medical Assistance Action Plan: Illinois Medical Program Outline and Blue Print for Action

(2003). Illinois is recognizing the need for families with disabled children to have a strong

support network. Programs are geared towards placing decision making controls in the hands of

the family and provide them with greater flexibility without placing a heavy financial burden on

the family as well as the community. Chicago Health and Disability Advocates, Medical

Assistance Action Plan: Illinois Medical Program Outline and Blue Print for Action (2003).

IV.    **A Sentence of Probation or Home Detention with Community Service Work**
       **Dedicated to a Low Income Housing Organization Satisfies the Goals of**
       **Punishment under 18 U.S.C. § 3553(a).**

Both the Supreme Court and Seventh Circuit law authorize this Court to impose a

sentence below the advisory guideline range as long as that sentence conforms with the § 3553(a)

factors. A sentence of probation or home detention with community service work dedicated to a

low-income housing organization is "sufficient but not greater than necessary," to achieve the

13

statutory purposes of punishment which are justice, deterrence, protection of society, and rehabilitation of the defendant. Booker, 125 S.Ct. 738 (2005.

First, justice is certainly served by this proposed sentence. Mr. Moorehead recognizes the seriousness of his offense and the resulting harm warrants imprisonment. However, justice would be better served by sentencing Mr. Moorehead to probation, work release or home detention with a condition of voluntary community service dedicated to assisting in the management of low-income housing. Mr. Moorehead may do this by participating in the Housing Abandonment Task Force, which is a city-wide coalition of neighborhood organizations. In addition, Mr. Moorehead may also be sentenced to assist Katrina victims in restoration of their housing affairs, such as property and financial management.

Second, the humiliating experience of being convicted of a federal crime has given Mr. Moorehead a deep respect for the law. Additionally, Mr. Moorehead now fully understands the extent to which he has jeopardized the future of his family by placing himself in a position where he may be incarcerated for an extended period of time. This knowledge is a powerful deterrent to any further wrongdoing.

Third, while protection of society and rehabilitation are minor considerations in this case, given the above examinations, Mr. Moorehead presents no risk of recidivism.

Fourth, it should be noted that Mr. Moorehead has had only one prior state conviction from the 1970s. Mr. Moorehead has not convicted of a crime for over 20 years. With this in mind, the Court can trust that Mr. Moorehead will comply with orders issued by the Court.

14

## V.     Conclusion

In determining a minimally sufficient sentence, the Court must ask whether a more severe sentence would achieve greater justice, deterrence, incapacitation, or rehabilitation. Respectfully, it would not in this case. Indeed, because a sentence within the original guideline range will not serve the needs of the public any better than the proposed sentence, such a sentence is greater than necessary under § 3553(a).

For the foregoing reasons, Mr. Moorehead respectfully requests that this Court impose a sentence of probation, work release or home detention with community service work dedicated to a volunteer management for low-income housing organization.

Respectfully Submitted,

FEDERAL DEFENDER PROGRAM
Terrence F. MacCarthy
Executive Director

By:  Luis M. Galvan

LUIS M. GALVAN
FEDERAL DEFENDER PROGRAM
55 E. Monroe Street, Suite 2800
Chicago, IL  60603
312-621-8352

15

## CERTIFICATE OF SERVICE

The undersigned, Luis M. Galvan, an attorney with the Federal Defender Program, hereby certifies that the following document(s):

SENTENCING MEMORANDUM

was served on September 26, 2006, in accordance with FED.R.CIV.P.5, LR5.5, and the General Order on Electronic Case Filing (ECF), pursuant to the district court's ECF system as to ECF filers, and if any, were sent by first-class mail or by hand delivery to non-ECF filers.

By:     s/Luis M. Galvan
        LUIS M. GALVAN
        FEDERAL DEFENDER PROGRAM
        55 East Monroe Street, Suite 2800
        Chicago, IL 60603
        312\621-8352

# Attachment

## Moorehead's Letter to the Court

The Honorable Judge James B. Zagel
Everett McKinley Dirksen Building
219 S. Dearborn Street, Room 2503
Chicago, IL 60604

Dear Judge Zagel:

Thank you for this opportunity to present my side as to what happened in this case.
During the five years that the investigation was going on, no one asked me what really happened,
not to even my previous private attorney who represented me for three years and the day before I
was indicted he dropped me as a client stating that I could not afford to pay them and leaving me
without any representation. However, one of the lawyers in the firm referred me to Luis Galvan
who agreed to take me on as a client and who has done a good job representing me.

You honor, I want to make it very clear what I did was wrong. I violated my contracts
and the trust of my clients. I did co-mingle funds by using funds form one project to another and
covering it up without approval. The monies were always put back. I also used my own funds
into these projects from time to time. What really happened was over the past ten years we
managed subsidized and public housing for the Chicago Housing Authority and private owners.
During this time there were times we would not receive funds from C.H.A to pay the expenses of
the operation of these buildings. Sometimes it took over 90 days yet I still had to meet payroll
and the operating expense of the buildings, so tenants would have the bare necessities, a safe
place to live with heat and running water. On one occasion in 2001 when I used my own money
(over $190,000.00) to pay contractors for work performed at one development I wasn't
reimbursed for TEN months. On many occasions the properties did not have money to operate

so I would transfer funds from one development to another but when the money came in I would put it back into the account. On many occasions I advanced monies to the projects from my company to meet their payroll so those employees of the buildings would get paid on time. I would reimburse my company when the funds became available.

I know what I did was wrong but it was not to intentionally hurt anyone, it was a very bad business practice and a way to keep cash flow for the projects.

I am not a person who takes from others. I am not now and have never been. I have worked hard all of my life from the time I was seven years old in the cotton fields of Mississippi up until now at the age of 63. My mother taught me to work hard and help others and that's what I have been doing. Over the past forty years I have committed my life to helping others. I have worked through several organizations in this city to provide affordable housing to more than 378 families and Senior through the near north corporation. I have worked and volunteered to provide health care to the under served through the Near North Health Service Corporation for the past 24 years as chairman of the Board of Directors. I served on the board of Directors for the New City YMCA for over seventeen years and the Chicago Council on Urban Affairs for over fifteen years and have volunteered and served in many other capacities. I have spent my entire adult life working to help others better our community and other peoples lives.

In reference to Marion Stamps Youth Center, this organization started out as the Tranquility Marksman Community Organization in the 1979's. Marion Stamps wanted to purchase a building at Clybourn and Division Street to start providing Social Services and other programs to the Near North and Cabrini Green community. She came to me and I loaned her the money as the down payment and again around 1988 they were about to loose the building for non payment of real estate taxes and I loaned them another $23,000, to pay the taxes and save the

building. In 1994 I paid another $4,000 to repair the heating system.

I have cooperated in very way possible in this case and it has dragged on for more than five years. It has destroyed my family and my business because people think that I can't be trusted even though I have given my life to serving other. I plead guilty to the case in 2004 to get the case behind me so that I could rebuild my life again at age 63. I also have to start rebuilding the trust that I destroyed. All of which I have lost due to this investigation and my health has also deteriorated over the last few years.

Your Honor, I have a 33 year old severely handicapped son who can't and never will be able to take care of himself or support himself. I also have a 17 year old son who has a learning disability and is in the process of graduating form high school this year. He needs my guidance and discipline to help him succeed.

I put myself at the mercy of the court and I pray that you will grant me that opportunity by giving me a compassionate sentence.

Sincerely,


William Moorehead

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 05 CR 546-1 |
| vs. | ) | |
| | ) | Judge James B. Zagel |
| WILLIAM MOOREHEAD | ) | |

<u>NOTICE OF FILING</u>

TO:    Jacqueline Stern
       Assistant United States Attorney
       219 S. Dearborn St., 5th Floor
       Chicago, IL 60604

       Please take notice that on this 26th day of September, 2006, the undersigned filed the
following document(s) in the above-captioned cause, a copy of which is attached hereto.

       SENTENCING MEMORANDUM


                                        <u>s/Luis M. Galvan</u>
                                        LUIS M. GALVAN
                                        FEDERAL DEFENDER PROGRAM
                                        55 East Monroe Street, Suite 2800
                                        Chicago, IL 60603
                                        312\621-8352


Dated: September 26, 2006